# In the United States Court of Appeals for the Sixth Circuit

THOMAS MERCK, individually and as a representative of the Class,
*Plaintiff-Appellant,*

v.

WALMART, INC.,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the Southern District of Ohio at Columbus
Case No. 2:20-cv-02908 (The Hon. Sarah Daggett Morrison)

## BRIEF OF PLAINTIFF-APPELLANT

E. MICHELLE DRAKE
JOSEPH C. HASHMALL
BERGER MONTAGUE PC
1229 Tyler Street, N.E.
Suite 205
Minneapolis, MN 55413
(612) 594-5933

MATTHEW W.H. WESSLER
THOMAS SCOTT-RAILTON
GUPTA WESSLER LLP
2001 K Street NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*

BETH E. TERRELL
ELIZABETH A. ADAMS
TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, WA 98103
(206) 816-3528

January 16, 2024                    *Counsel for Plaintiff-Appellant*

# DISCLOSURE OF CORPORATE AFFILIATIONS
# AND FINANCIAL INTEREST

Under Sixth Circuit Rule 26.1, Plaintiff-Appellant makes the following

disclosures:

1.  Are any parties a subsidiary or affiliate of a publicly owned
    corporation?

    **NO.**

2.  Is there a publicly owned corporation, not a party to the appeal, that
    has a financial interest in the outcome?

    **NO.**

Dated: January 16, 2024

# TABLE OF CONTENTS

Disclosure of corportate affiliations and financial interest ........................................ i

Table of authorities .................................................................................. iv

Introduction ........................................................................................... 1

Jurisdictional statement ............................................................................ 3

Statement of the issue ............................................................................... 3

Statement of the case ................................................................................ 3

    I.   Statutory background ........................................................................ 3

    II.  Factual background ......................................................................... 12

    III. Procedural history ......................................................................... 15

Standard of review .................................................................................. 18

Summary of argument ............................................................................... 18

Argument ............................................................................................... 25

    I.   Mr. Merck suffered a paradigmatic informational injury
         because Walmart's failure to tell him the true reason it didn't
         hire him had adverse effects. ....................................................... 25

    II.  Because Walmart's unlawful decisionmaking process resulted in
         concrete harm, Mr. Merck was not required to show that the
         outcome would have been different but for the FCRA
         violation. .................................................................................. 32

    III. Congress appropriately granted Mr. Merck the right to sue for
         harms that have a close relationship to traditional harms
         recognized by the Constitution and the common law. ..................... 36

        A.   Courts must give due weight to Congress's conclusion
            that a violation of subpart A is harmful. ................................. 37

B.    There is a close relationship between the harm to Mr. Merck from Walmart's violation of subpart A and the traditionally recognized harm of denial of pre-deprivation notice and the opportunity to be heard. .................39

C.    There is also a close relationship between Walmart's failure to disclose material information and common law tort and contract claims. ......................................................44

Conclusion ........................................................................................ 48

Certificate of compliance

Certificate of service

Addendum

# TABLE OF AUTHORITIES

## Cases

*Allen v. Wright,*
468 U.S. 737 (1984) ................................... 40

*American Canoe Association, Inc. v. City of Louisa Water & Sewer Commission,*
389 F.3d 536 (6th Cir. 2004) .......................... 26, 27

*Anderson National Bank v. Luckett,*
321 U.S. 233 (1944) ................................... 41

*Azeez v. Lifespan Corporation,*
635 F. Supp. 3d 75 (D.R.I. 2022) ...................... 38

*Brintley v. Aeroquip Credit Union,*
936 F.3d 489 (6th Cir. 2019) ................ 18, 19, 27, 28

*Bryant v. TRW, Inc.,*
689 F.2d 72 (6th Cir. 1982) ........................... 4, 11

*Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014) ................................... 40

*Carey v. Piphus,*
435 U.S. 247 (1978) ....................... 23, 39, 43, 44

*Cleveland Board of Education v. Loudermill,*
470 U.S. 532 (1985) ................................*passim*

*Department of Education v. Brown,*
600 U.S. 551 (2023) ...................... 20, 21, 32, 33

*Dickson v. Direct Energy, LP,*
69 F.4th 338 (6th Cir. 2023) ......................*passim*

*EEOC v. Abercrombie & Fitch Stores, Inc.,*
575 U.S. 768 (2015) ................................... 40

*FEC v. Akins,*
    524 U.S. 11 (1998) ..................................................................*passim*

*Gadelhak v. AT&T Services, Inc.,*
    950 F.3d 458 (7th Cir. 2020) ........................................... 22, 41

*Gilmore v. Sapp,*
    100 Ill. 297 (1881) .............................................................42

*Grae v. Corrections Corporation of America,*
    57 F.4th 567 (6th Cir. 2023) .........................................*passim*

*Harty v. West Point Realty, Inc.,*
    28 F.4th 435 (2d Cir. 2022) .......................................... 19, 27

*Havens Realty Corporation v. Coleman,*
    455 U.S. 363 (1982) ......................................................... 40

*Jones v. Bottom,*
    85 F.4th 805 (6th Cir. 2023) ............................................38

*Kelly v. RealPage Inc.,*
    47 F.4th 202 (3d Cir. 2022) ...........................18, 26, 27, 28

*Kerber v. Wayne County Employees Retirement Systems,*
    2021 WL 2795802 (6th Cir. Aug. 2, 2021) ..........................44

*LaChance v. Erickson,*
    522 U.S. 262 (1998) ..................................................... 23, 41

*Laufer v. Looper,*
    22 F.4th 871 (10th Cir. 2022) .....................................27, 28

*Long v. Southeastern Pennsylvania Transportation Authority,*
    903 F.3d 312 (3d Cir. 2018) ...........................................*passim*

*McKay v. Federspiel,*
    823 F.3d 862 (6th Cir. 2016) ...................................18, 31, 36

*Ohio v. Raimondo,*
    848 F. App'x 187 (6th Cir. 2021) ......................................26

*Peralta v. Heights Medical Center, Inc.*,
    485 U.S. 80 (1988)..................................................................... 41

*Public Citizen v. U.S. Department of Justice*,
    491 U.S. 440 (1989) ............................................................. *passim*

*Rees v. City of Watertown*,
    86 U.S. 107 (1873) ...................................................................42

*Rice v. Village of Johnstown, Ohio*,
    30 F.4th 584 (6th Cir. 2022)................................................. *passim*

*Robertson v. Allied Solutions, LLC*,
    902 F.3d 690 (7th Cir. 2018)................................................ *passim*

*Schumacher v. SC Data Center, Inc.*,
    33 F.4th 504 (8th Cir. 2022) ...................................................38

*Sharp v. Technicolor Videocassette of Michigan, Inc.*,
    2019 WL 167423 (W.D. Tenn. Jan. 10, 2019)......................... 16

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ............................................................. *passim*

*Sugar Cane Growers Co-op. of Florida v. Veneman*,
    289 F.3d 89 (D.C. Cir. 2002) ....................................................35

*Thomas v. FTS USA, LLC*,
    193 F. Supp. 3d 623 (E.D. Va. 2016)...................................... 16

*TransUnion LLC v. Ramirez*,
    591 U.S. 413 (2021)............................................................. *passim*

*Treadway v. Gateway Chevrolet Oldsmobile Inc.*,
    362 F.3d 971 (7th Cir. 2004) ..................................................... 4

*Uzuegbunam v. Preczewski*,
    141 S. Ct. 792 (2021) ...............................................................44

*Walker v. Fred Meyer, Inc.*,
    953 F.3d 1082 (9th Cir. 2020) .................................................38

*Ward v. National Patient Account Services Solutions, Inc.*,
  9 F.4th 357 (6th Cir. 2021) ................................................................ 17, 32

*Wright v. O'Day*,
  706 F.3d 769 (6th Cir. 2013) ...................................................................34

**Statutes**

15 U.S.C. § 1681 .............................................................................. *passim*

28 U.S.C. §1291 ...................................................................................... 3

**Other Authorities**

116 Cong. Rec. 36570 (1970) ................................................................... 4

Charles A. Wright & Arthur R. Miller,
  *Federal Practice & Procedure* (3d ed. 2017)..........................................42

Charles T. McCormick,
  *Handbook on the Law of Damages* (1935) .............................................43

Dan D. Dobbs,
  *Law of Remedies* (1973) .........................................................................43

Fed. R. Civ. P. 56 .................................................................................. 18

Professional Background Screening Association,
  *Background Screening: Trends and Uses in Today's Global Economy* (2020). .................... 10

Restatement (First) of Torts (1938).................................................. 41, 43

Restatement (Second) of Contracts (1981) ........................................ 24, 45

Restatement (Second) of Torts (1977)..........................................24, 45, 48

Restatement (Third) of Restitution and Unjust Enrichment (2011) ................. 24, 46

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Plaintiff-Appellant Thomas Merck respectfully requests oral argument. This appeal raises an issue that has divided courts across the country: Whether an individual is harmed when an employer unlawfully revokes her job offer based on a consumer report that she has never had the chance to review or address? Not only have other courts split on this question, but the district court below initially held there was harm, and therefore Article III standing, before later reaching the opposite conclusion based on the view that *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) changed the law. In shifting its position, the court below misunderstood the state of the law on informational harms and procedural violations in the wake of *TransUnion*, and also misstated the proper analysis under *TransUnion* of Congress's authority to elevate statutory harms that bear a close relationship to traditionally recognized harms. Oral argument is warranted to clarify the district court's errors and fully address these questions for the Court's benefit.

## INTRODUCTION

When Congress enacted the Fair Credit Reporting Act, it understood that the private consumer reporting agencies that sweep up and compile information about people don't always get it right. Sometimes the information is inaccurate, other times it lacks crucial context. So when a person's employment is at stake, Congress created a simple rule: You can't be fired or have a job offer revoked based on a consumer report without first being given a chance to review and address it. *See* 15 U.S.C. § 1681b(b)(3)(A). If the report is inaccurate, you can tell an employer before they reject your job application. If the report is misleading without further context, you can tell your side of the story before you lose your job. This requirement—notice and an opportunity to be heard before an adverse action is taken—has existed for decades. It helps employers by ensuring that they do not needlessly turn away qualified applicants, and it protects individuals from losing or being denied a job based on inaccuracies or inadequate context.

But Thomas Merck, the appellant here, never got that chance. When Mr. Merck applied for an entry-level position at a Walmart store in Ohio, the interviewer told him that he was a shoo-in and extended a conditional job offer. However, a consumer report then turned up a 15-year-old misdemeanor conviction that Mr. Merck had not reported. The reason was benign (and undisputed): after a decade and a half, Mr. Merck had forgotten about it. While the conviction itself was not a

dealbreaker—Walmart admits Mr. Merck would have gotten the job despite it—the company intended to revoke his offer because he had failed to report the conviction.

At that point, Walmart's duties under the FCRA were straightforward. *Before* taking any adverse action, it was required to give Mr. Merck a complete copy of the report to review and address. Instead, Mr. Merck received an incomplete and misleading report that didn't include the real reason his offer was being revoked—making it hard for him to address it. When he reapplied months later, he was still in the dark and so again did not explain that he'd left off this conviction from his youth because he'd forgotten it. Even though he was indisputably qualified, he did not make it to the interview stage.

Despite this, the district court concluded that Mr. Merck had not been harmed by Walmart's violation of the FCRA and therefore lacked Article III standing to bring his claim. That was wrong for three independent reasons. First, Mr. Merck suffered a paradigmatic informational harm. Walmart's failure to tell Mr. Merck the true reason his application was denied limited his ability to understand what went wrong and to advocate for himself. Second, Mr. Merck was harmed by a decision reached through unlawful procedures and, accordingly, has standing even if he cannot show that following those procedures would have led to a different outcome. That familiar principle is commonplace in contexts like notice-and-comment rulemaking and applies here. Third, Congress appropriately granted Mr. Merck

standing to sue for a harm with a close relationship to the traditionally recognized harm of a denial of notice and an opportunity to be heard, including in the employment context. Whichever way you cut it, Mr. Merck was harmed. The district court's decision to the contrary should be reversed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 15 U.S.C. § 1681p. On July 28, 2023, the district court granted Walmart's motion for summary judgment. Op. and Order, R. 114, PageID#2590. Mr. Merck then filed a timely notice of appeal on August 22, 2023. Pl.'s Notice of Appeal, R. 116, PageID#2608. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Did the district court err when it held that Mr. Merck was not harmed and therefore had not suffered any Article III injury after Walmart revoked his conditional job offer based on information in a consumer report that Mr. Merck was never given the chance to review or address in violation of 15 U.S.C § 1681b(b)(3)(A)?

## STATEMENT OF THE CASE

### I. Statutory background

**A.** "In 1970, Congress passed and President Nixon signed the Fair Credit Reporting Act" to ensure "fair and accurate credit reporting." *TransUnion LLC v.*

*Ramirez*, 591 U.S. 413, 418 (2021) (quoting 15 U.S.C. § 1681(a)).[1] More specifically, "Congress enacted the FCRA in 1970 to address abuses in the consumer reporting industry." *Treadway v. Gateway Chevrolet Oldsmobile Inc.*, 362 F.3d 971, 981 (7th Cir. 2004). Private consumer reporting agencies sweep up and compile a vast range of information about individuals, including not only their "credit worthiness, credit standing, [and] credit capacity," but also their "character, general reputation, personal characteristics, or mode of living." 15 U.S.C. § 1681(a)(2). Congress was concerned about insufficient standards and accountability in the industry tasked with these "grave responsibilities," and that there could be serious consequences to reports that were inaccurate, incomplete, or lacked context. § 1681(a)(4). People could be turned down for badly needed loans or face serious obstacles to obtaining automobiles or housing. And, as relevant to this appeal, people could lose their jobs or never get one. Congress understood that in the world consumer reporting built, "the individual is in great danger of having his life and character reduced to impersonal 'blips' and key-punch holes in a stolid and unthinking machine which can … make him unemployable." *Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) (quoting 116 Cong. Rec. 36570 (1970)).

---

[1] Unless otherwise noted, all internal quotation marks, citations, alterations, brackets, and ellipses have been omitted from quotations throughout this brief.

To address this, Congress created a framework of protections to ensure not just the "accuracy" of information in consumer reports, but also its "confidentiality," "relevancy, and proper utilization." § 1681(b); *see also* §1681(a)(4) (such information must be compiled and used "with fairness, impartiality, and a respect for the consumer's right to privacy"). Among other things, "the Act regulates … the use of consumer reports … for certain specified purposes, including … employment." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 334–35 (2016).

**B.** Since 1970, Congress has also amended the FCRA to address problems that have emerged as the use of consumer reports has become increasingly widespread. As relevant here, in 1996, Congress acted to protect people at risk of losing out on a job based on information in consumer reports they'd never seen or had a chance to address. Congress understood the danger that a person could become or remain unemployed simply because of shortcomings in consumer reports that she could easily address if given a chance. To make sure that people have this chance, Congress enacted provisions to regulate "using a consumer report for employment purposes." § 1681b(b)(3)(A).

**1.** There are three relevant actors in the employment context. First, there are the employees or prospective employees who are the subject of the consumer reports. Second, there are the employers who request and review the reports in making an employment decision. And third, there are the consumer-reporting agencies

themselves, who compile and provide the reports. The 1996 amendments establish a framework governing the rights and duties for this three-part relationship. The protections also reflect the Act's core goals of "privacy," "fairness," and "accuracy" in the use of consumer reports. § 1681(b); *see also* §1681(a)(4).

**2.** To safeguard privacy, § 1681b(b)(1)(A)(i) requires an employer to obtain an individual's consent to access her consumer report. If she consents, the employer is authorized to contact a consumer-reporting agency for a copy of the report.

**3.** To ensure both fairness and accuracy in employment decisions, Congress enacted § 1681b(b)(3)(A) ("subpart A"). If an employer "intend[s] to take … adverse action" based on information in a consumer report, the employer must provide the individual with "a copy of the report," and must do so "*before* taking any adverse action" so that she can review and address it. *Id.* (emphasis added).

This "pre-adverse action requirement" guarantees that a job applicant (or current employee) "will have a chance to review the actual document on which the employer relied, and that she can do so with time to respond to unfavorable information." *Robertson v. Allied Sols., LLC*, 902 F.3d 690, 696 (7th Cir. 2018). The applicant can then address inaccuracies in the report or provide crucial context that might be missing from technically accurate information. *See Long v. Se. Pa. Transp. Auth.*, 903 F.3d 312, 319 (3d Cir. 2018) ("The required pre-adverse-action copy of an individual's consumer report … may also enable him to advocate for it to be used

fairly—such as by explaining why true but negative information is irrelevant to his fitness for the job."). This opportunity is vital, as "[p]roviding context may be more valuable than contesting accuracy." *Robertson*, 902 F.3d at 697.

In establishing subpart A's requirements—notice of allegations and an opportunity to be heard before any adverse employment action is taken—Congress was following in the footsteps of protections that had already existed for years under the Due Process Clause for many public employees. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542–43 (1985). The Supreme Court had recognized the need for "some opportunity for the employee to present his side of the case" before an employer could take adverse action. *Id.* at 543. This was, the Court explained, "of obvious value in reaching an accurate decision," but "[e]ven where the facts are clear, the appropriateness or necessity of the discharge may not be; in such cases, the only meaningful opportunity to invoke the discretion of the decisionmaker is likely to be before the termination takes effect." *Id.* For example, the Supreme Court protected the due process rights of an individual who hadn't disclosed a conviction on a job application because he had misremembered it and lost his job without "an opportunity to respond to the charge of dishonesty." *Id.* at 535.

**4.** In addition to allowing an individual to address a consumer report with an employer, Congress also wanted to afford job applicants and employees the opportunity to verify that the information in consumer-reporting agencies' files is

accurate and complete. That way, if an employer was misled by inaccurate or incomplete information in a consumer report, an individual can also make sure this doesn't happen again the next time an employer requests her consumer report. To that end, an individual must also be given a list of the general "rights of the consumer" under the FCRA. § 1681b(b)(3)(A)(ii). These includes the right to request consumer reports "from each consumer reporting agency," the "frequency and circumstances under which a consumer is entitled to receive a consumer report without charge" from these agencies, and "how to obtain a credit score" from these agencies. §§ 1681g(c)(1)(B)(i), (ii), (iv). Once a person obtains her report from a given agency, she can then seek "to dispute information in [her] file" with that agency—a process that can take weeks. § 1681g(c)(1)(B)(iii); *see generally* § 1681i.

**C.** The pre-adverse action requirement that Congress crafted in subpart A is "unique" among the FCRA's procedures. *Robertson*, 902 F.3d at 696. Two neighboring provisions illustrate this.

**1.** Right below subpart A, in subpart B, Congress carved out a limited exception to the pre-adverse action requirement for truck drivers. *See* § 1681b(b)(3)(B). This carve-out applies if a truck driver applies for employment by "mail, telephone, computer, or other similar means." *Id.* In such a situation, a company can take adverse action based on information in a consumer report without providing the applicant with a copy of the report. *Id.* Nor does the company need to provide any

notice *before* the adverse employment action to give him the chance to address the contents of the report. *Id.* Instead, "within 3 business days of taking such action," the company can just provide him with information such as "the name, address and telephone number of the consumer reporting agency that furnished the consumer report" and how he can "request a free copy of a report." §§ 1681b(b)(3)(B)(II), (IV). And unlike subpart A, the truck driver's right to contest the report is expressly limited to disputing with the consumer-reporting agency "the accuracy or completeness" of the information in their files. § 1681b(b)(3)(B)(IV).

**2.** Outside of the employment context, the FCRA also provides guidance for entities taking adverse action based on consumer reports. In this broader context, if an entity "tak[es] adverse action[] on [the] basis of information contained in consumer reports," it does not need to provide a person with a copy of the report. § 1681m(a). Nor is prior notice of the adverse action required. Instead, under the FCRA, it is only *after* taking the adverse action that an entity must provide the person with the contact information for the consumer-reporting agency and explain how the individual can request her consumer report. §§ 1681m(a)(3), (4). And here, too, any disputes with the credit agency are expressly limited to challenges to "the accuracy or completeness of any information in a consumer report furnished by the agency." § 1681(m)(a)(4)(B).

**3.** Accordingly, subpart A is "unique" in that it: (1) requires the decisionmaker to automatically provide the individual with a copy of the report; (2) requires this disclosure *before* the adverse action is taken, giving someone a chance to address it; and (3) does not limit an individual's opportunity to address the report to challenges to the accuracy and completeness of the information in the consumer reporting agency's files. *Robertson*, 902 F.3d at 696. By contrast, the FCRA's other similar procedural requirements are limited to ensuring that information in consumer-reporting agencies' files is complete and accurate.

**D.** Subpart A's protections are, if anything, more necessary now than ever. The vast majority of employers—up to 94%—use a background check of some kind.[2] These checks can make or break someone's application, making the difference between gainful employment and the unemployment line.

And Congress's concerns about the shortcomings of consumer reports also continue to be borne out over time. These reports can contain striking inaccuracies—consider, for instance, the thousands of people who were misleadingly flagged as possible terrorists or international drug dealers just because of similar names. *See TransUnion*, 594 U.S. at 420. Consumer reports can also contain more mundane errors or simply lack crucial context. Subpart A's protections ensure that

---

[2] Pro. Background Screening Ass'n, *Background Screening: Trends and Uses in Today's Global Economy* 3 (2020), https://perma.cc/U35R-2VU7.

when someone's ability to make a living is on the line, she is not reduced to just "impersonal blips," *Bryant*, 689 F.2d at 79, but has a chance to provide context to an employer. This could mean offering context about past information that may be technically accurate but does not reflect who she is today. Or it could mean explaining that a piece of information—like a 15-year-old misdemeanor—was not included in her job application simply because she had forgotten it. Subpart A's modest protections are a low price to avoid the "erroneous and counterproductive step of forcing … employees onto the welfare rolls." *Cleveland Bd. of Educ.*, 470 U.S. at 544.

Subpart A's benefits, moreover, do not just accrue to the job applicant or employee alone. Without pre-adverse action notice and an opportunity to be heard, employers would miss out on qualified applicants who have made mistakes in the past that are not relevant to their fitness for the job—or who simply made a mistake in filling out a job application. *See Long*, 903 F.3d at 319. The same goes for existing employees; an employer may miss out on "a qualified employee" and shoulder the extra costs of having "to train a new one." *Cleveland Bd. of Educ.*, 470 U.S. at 544. Or a position may go unfilled for longer, leaving the employer unnecessarily short-staffed. Walmart itself now recognizes the benefits of such a system, providing individualized opportunities for applicants like Mr. Merck to offer context for their background reports. *See* Walmart Class Cert. Opp., R. 102, PageID#1873–74.

## II.    Factual background

In April 2016, Mr. Merck applied for an entry-level job with Walmart in Coshocton, Ohio.  Op. and Order, R. 114, PageID#2590–91; First Am. Class Action Compl., R. 16, PageID#75. He was promptly called in for an interview and told by his interviewer "that everything looked really good" and that "[s]he didn't see a problem why [he] would not be hired."  Op. and Order, R. 114, PageID#2591. The final step was "to do a background check as a formality. As soon as that came back [he] would be contacted with a schedule to start." *Id.* As the district court recognized, this constituted a "conditional job offer." *Id.*

Consistent with the FCRA, Walmart then asked Mr. Merck to fill out an authorization for a background check and accompanying paperwork. *Id.* On one of those forms, Mr. Merck was asked whether he had ever been convicted of any crimes. *Id.* Fifteen years earlier, Mr. Merck had pleaded guilty to misdemeanor theft. *Id.*; PageID#1978. This is his only conviction and he did not spend any time in jail. Order Denying Mot. to Dismiss, R. 37, PageID#285; PageID#1978. By the time he applied to Walmart, he had forgotten all about his conviction as a young man—a fact that Walmart does not dispute. Thomas Merck Dep. Tr., R. 105-3, PageID#2215, 2237. So Mr. Merck answered to the best of his recollection, checking a box indicating that he did not have any convictions. Op. and Order, R. 114, PageID#2591. Had Mr. Merck remembered and reported this 15-year-old misdemeanor, it would not have

been a big deal; Walmart does not dispute that he would have gotten the job anyways. Op. and Order, R. 114, PageID#2592.

Walmart then ordered a background report from a third-party vendor, Sterling Infosystems, Inc. Op. and Order, R. 114, PageID#2592. Sterling found a record of Mr. Merck's misdemeanor conviction and identified the discrepancy with his paperwork. Op. and Order, R. 114, PageID#2593. In the report that Sterling produced, it included the code "R3," indicating "that an item was found that was not self-reported by the candidate," which rendered him "Not Competitive." Op. and Order, R. 114, PageID#2593–94. Sterling provided that report to Walmart. *Id.* Walmart intended to revoke the offer because of Mr. Merck's failure to report his misdemeanor, and Mr. Merck was thus set to lose out on his job offer because of information in a consumer report. *Id.*; Order Denying Mot. to Dismiss, R. 37, PageID#285.

At that point, under subpart A of the FCRA, Mr. Merck was entitled to "[a] copy of *the* report" "before" Walmart took "any adverse action based in whole or in part on the report." §1681b(b)(3)(A) (emphasis added). But Mr. Merck was not sent "the" report. Instead, he was given an incomplete version that included the misdemeanor conviction, but crucially did not include the R3 code. Op. and Order, R. 114, PageID#2593. It thus omitted the *actual* basis for the adverse action. *Id.* As the district court explained, Walmart's conduct here violated subpart A because

13

"[s]ubpart A requires not just '**_any_** report' or '**_a_** report'; rather, the employer is required to provide an applicant a copy of "**_the_** report' that forms the basis, in whole or in part, of its decision not to hire that applicant." Order Denying Mot. to Dismiss, R. 37, PageID#299.

The district court also recognized that violating subpart A in this regard is not trivial. "If the applicant is given a different report, an incomplete report, or no report at all, he cannot meaningfully respond to the employer's concerns." *Id.* And that is just what happened here. Before Walmart revoked his offer, Mr. Merck tried calling to figure out the reason he was not being hired, but he was unable to get an answer. Op. and Order, R. 114, PageID#2593. And at that point, Walmart had not yet adopted its current procedures that allow prospective employees like Mr. Merck to dispute or contextualize information in their background reports. *See* Walmart Class Cert. Opp., R. 102, PageID#1873–74. Walmart thus revoked Mr. Merck's offer and denied his application without telling him the real reason or giving him a chance to address it.

Worse still, the report's incompleteness was misleading. Because the incomplete report was presented as the basis for Walmart's upcoming adverse action, it gave the misleading impression that the decision was based on the existence of the conviction itself. Ex. 1 to First Am. Compl., R. 16-1, PageID#91. Mr. Merck was therefore not only left in the dark, but sent down the wrong path.

Under Walmart's policies, Mr. Merck was eligible to apply again after 60 days and his background report expired after that 60-day period. Op. and Order, R. 114, PageID#2603–04; Summ. J. Opp'n Ex. A, R. 105-1, PageID#2128. Mr. Merck reapplied twice for jobs with Walmart, in August and November of 2016. Op. and Order, R. 114, PageID#2604. But he did not make it to the interview stage and was thus never asked to disclose his criminal history. *Id.* These Walmart jobs had higher salaries than his job at the time, and it took him months before he was able to find a better-paying job. Thomas Merck Dep. Tr., R. 105-1, PageID#2206; First Am. Compl., R. 16, PageID#82. Because the background report had reminded Mr. Merck of his conviction, he disclosed it in his subsequent application for that job. Thomas Merck Dep. Tr., R. 105-3, PageID#2213. Mr. Merck testified that, after his experience with Walmart, it took him "a little while longer before I finally worked up the courage to apply where I am now." *Id.*, PageID#2206. His new job is providing in-home care at the Residential Home for the Developmentally Disabled. *Id.*, PageID#2206, 2224.

### III. Procedural history

Mr. Merck only learned the actual reason he had not gotten the Walmart job in 2019, as the result of discovery in a separate lawsuit. Order Denying Mot. to Dismiss, R. 37, PageID#286. After learning that Walmart had violated his rights under subpart A, Mr. Merck filed suit in the Southern District of Ohio. Op. and

Order, R. 114, PageID#2593. In response, Walmart moved to dismiss for lack of standing.

The district court denied the motion to dismiss. The court explained that "an applicant suffer[s] an injury-in-fact from an employer's failure to provide, in advance of taking adverse action, a copy of the report on which it based the adverse action, even when there is no allegation that the report contains inaccurate information." Order Denying Mot. to Dismiss, R. 37, PageID#291. The district court noted that the overwhelming weight of authority supported this conclusion. *Id.* (citing *Robertson*, 902 F.3d at 697; *Long*, 903 F.3d at 318, 324; *Sharp v. Technicolor Videocassette of Mich., Inc.*, 2019 WL 167423, at *3 (W.D. Tenn. Jan. 10, 2019); *Thomas v. FTS USA, LLC*, 193 F. Supp. 3d 623, 638 (E.D. Va. 2016)). After a detailed statutory analysis, the district court joined the consensus, holding that Mr. Merck's "injury is concrete and particular to him in that he was entitled to receive and review the actual consumer report that Walmart relied upon" and that "[w]hen he was provided with a copy of a different report, he was deprived of the information that could have allowed him to respond to Walmart's concerns." Order Denying Mot. to Dismiss, R. 37, PageID#289.

After discovery, Mr. Merck moved for class certification and Walmart moved for summary judgment, again challenging Mr. Merck's standing. Op. and Order, R. 114, PageID#2605–06. This time, however, the district court agreed with Walmart. The court concluded that the Supreme Court's intervening decision in *TransUnion*,

16

594 U.S. at 417, and this Court's decision in *Ward v. National Patient Account Services Solutions, Inc.*, 9 F.4th 357 (6th Cir. 2021), had changed the law such that Mr. Merck had no longer suffered any Article III harms. On this view, "a violation of the FCRA's pre-adverse action notice requirements does not result in concrete harm unless the consumer report was inaccurate or the statutory violation was a but-for cause of the adverse employment action." Op. and Order, R. 114, PageID#2605. According to the district court, because the report here was not inaccurate, Mr. Merck needed to show that Walmart "would have hired [him] had [he] received the required notice." *Id.* Because Walmart asserted that it would not have hired Mr. Merck in April 2016 even if he had explained the situation, the court held that he had failed to show the requisite causal link and, therefore, did not suffer any harm capable of establishing standing. *Id.*

As to Mr. Merck's re-applications in August and November, the district court recognized it was possible that "employees at the particular store where [he] was applying recognized his name as someone who had failed a background check, and therefore chose not to reinterview him, thinking he would fail if he reached that step again." Op. and Order, R. 114, PageID#2604. However, the court again concluded that Mr. Merck had not shown that the outcome would have been different. *Id.*

**STANDARD OF REVIEW**

This Court reviews "de novo a district court's grant of summary judgment and dismissal for lack of standing." *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016). "Summary judgment is appropriate only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). In this analysis, courts "consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Id.*

**SUMMARY OF ARGUMENT**

**I.** Mr. Merck suffered a paradigmatic informational injury from Walmart's failure to provide him with the report containing the real reason his conditional job offer was revoked. The Supreme Court has long recognized that concrete harm can arise when someone is denied information to which they are entitled by law. "[T]o state a cognizable informational injury" of this kind, Mr. Merck needs to show "[1] that [he] failed to receive required information, and [2] that the omission led to adverse effects or other downstream consequences." *Grae v. Corr. Corp. of Am.*, 57 F.4th 567, 570 (6th Cir. 2023) (quoting *Kelly v. RealPage Inc.*, 47 F.4th 202, 214 (3d Cir. 2022)). Satisfying this bar is not "difficult." *Id.* at 571. It requires showing that "the information had 'some relevance' to [him]," *Brintley v. Aeroquip Credit Union*, 936 F.3d 489, 493 (6th Cir. 2019), or, in other words, "that he has an interest in using the

information beyond bringing his lawsuit," *Grae*, 57 F.4th at 571 (quoting *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 444 (2d Cir. 2022)).

In this case, Walmart's failure to disclose the actual report required by subpart A had adverse effects on Mr. Merck's ability to determine what had gone wrong with his initially promising application, as well as his ability to advocate for himself during the application process. As any job applicant can tell you, such information is clearly of "some relevance." *Brintley*, 936 F.3d at 493. These adverse effects are, if anything, more personalized and concrete than effects the Supreme Court has found sufficient. For example, parties had standing when they were denied information that would help them generally "evaluate candidates for public office," *FEC v. Akins*, 524 U.S. 11, 21 (1998), or track what happened at committee meetings and engage in advocacy, *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 449 (1989). If a general interest in understanding politics and engaging in advocacy are enough, then surely the same goes for a job applicant's specific interest in understanding what went wrong with his own job application and his specific interest in advocating on his own behalf. Nothing more is required—these cases do not force a plaintiff to show that the contemplated advocacy would have moved the needle.

**II.** Separately, Mr. Merck also has standing because he was injured by a decision that arose from an unlawful decisionmaking process. "[W]hen a statute affords a litigant a procedural right to protect his concrete interests"—such as an

interest in employment—a plaintiff need not show that a procedural violation was a but-for cause of harm to those concrete interests. *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023). This principle is familiar from contexts like challenges to an agency's failure to conduct notice-and-comment rulemaking, and it is applicable to the procedural violation and concrete harm here. A plaintiff harmed by an employer's adverse employment decision has standing to challenge the employer's failure to follow the statutorily required procedures "even though he cannot establish with any certainty" that following the proper procedures "will cause" a change in the result. *Id.* Put otherwise, so long as the ultimate decision harms the plaintiff, "the fact that the defendant might well come to the same decision after abiding by the contested procedural requirement does not deprive a plaintiff of standing." *Id.* at 561–62.

The district court ran afoul of this basic principle. It held that, to establish standing, Mr. Merck was required to prove that Walmart's violation of subpart A was the reason his offer was revoked. According to the court, "a violation of the FCRA's pre-adverse action notice requirements does not result in concrete harm unless … the statutory violation was a *but-for cause* of the adverse employment action." Op. and Order, R. 114, PageID#2605 (emphasis added). This runs headlong into controlling precedent: A plaintiff "need not show that *but for* the alleged procedural deficiency the [defendant] would have reached a different substantive result." *Rice v.*

*Vill. of Johnstown, Ohio*, 30 F.4th 584, 593 (6th Cir. 2022) (emphasis added); *see also Brown*, 600 U.S. at 561 (same).

Instead, under Article III, "it is enough to show that the procedural step was connected to the substantive result," such as if an "application was denied through an allegedly [unlawful] process." *Rice*, 30 F.4th at 593. That is precisely what happened here. Mr. Merck was not given notice of the true reason his application was being denied. He was not given the chance to address the basis for that decision. And the decision to revoke his offer was classic economic harm. That's all that is required for Article III purposes. Left to stand, the district court's onerous but-for causation requirement would make a hash of longstanding caselaw on procedural violations, which, among other things, protects individuals' standing to challenge agency actions taken without complying with proper procedures.

**III.** Even if these informational and economic harms did not in themselves satisfy Article III—they do—then Congress still appropriately elevated Mr. Merck's harm and granted him standing to sue. "Congress may 'elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law.'" *TransUnion*, 594 U.S. at 425, 432 (quoting *Spokeo*, 578 U.S. at 341). "[B]oth history and the judgment of Congress play important roles" in this analysis. *Spokeo*, 578 U.S. at 340. Here, Congress appropriately granted Mr. Merck standing to sue for an injury

that bears a close relationship to the traditionally recognized harm of a deprivation of notice and an opportunity to be heard, including in the employment context.

**A.** First, "[c]ourts must afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation of that statutory prohibition or obligation." *TransUnion*, 594 U.S. at 425 (citing *Spokeo*, 578 U. S. at 340–41). Here, "Congress granted the consumer a right to receive a copy of his report before adverse action is taken, and provided for statutory damages plus attorney's fees for willful noncompliance," "which clearly illustrates that Congress believed that th[is] violation of FCRA causes a concrete harm to consumers." *Long*, 903 F.3d at 323–24.

**B.** Second, "the asserted harm" in this case "has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 417. This analysis "look[s] for a 'close relationship' *in kind, not degree*" between the statutory harm and a traditional harm. *Dickson v. Direct Energy, LP*, 69 F.4th 338, 344 (6th Cir. 2023) (quoting *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462–63 (7th Cir. 2020) (Barrett, J.)). Examples of "traditional" harms can come from the common law or from "harms specified by the Constitution itself." *TransUnion*, 594 U.S. at 425 (citing cases); *see also Spokeo*, 578 U.S. at 340 (harms to "free speech" and "free exercise" are quintessential examples of traditional "intangible injuries").

There is a close relationship in kind between Walmart's violation of subpart A and the denial of notice and an opportunity to be heard before adverse action is taken, a traditionally recognized harm under the Constitution's guarantee of procedural due process and the common law. "The core of due process is the right to notice and a meaningful opportunity to be heard." *LaChance v. Erickson*, 522 U.S. 262, 266 (1998). The common law has long safeguarded similar rights. *See Robertson*, 902 F.3d at 696. This principle extends to public employment, where in many instances the loss of a job must "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ.*, 470 U.S. at 542. This is true even when the underlying facts are undisputed, as an individual must still have a chance to provide their "side of the case." *Id.* at 543. And the failure to provide notice and an opportunity to be heard is harm sufficient for a suit, even if no further harm can be proved. *See Carey v. Piphus*, 435 U.S. 247, 266–67, 266 n.23 (1978).

The relationship between this harm and Mr. Merck's is close indeed. The Supreme Court vindicated the procedural due process rights of an individual who had failed to disclose a criminal conviction on his job application because he had misremembered and lost his job without "an opportunity to respond to the charge of dishonesty." *Cleveland Bd. of Educ.*, 470 U.S. at 535. Mr. Merck plainly suffered "the same *kind* of harm" as this. *Dickson*, 69 F.4th at 344.

**C.** In addition, the common law also recognized a range of tort and contract claims based on failures to disclose material information or statements that are materially misleading because they are incomplete. *See* Restatement (Second) of Torts §§ 538, 539, 551 (1977); Restatement (Second) of Contracts § 164 (1981); Restatement (Third) of Restitution and Unjust Enrichment § 13 cmt. c (2011). There is a close relationship in kind between these claims and Walmart's failure to disclose to Mr. Merck the real reason his application was being revoked.

The district court tried to dodge this analogy by concluding that, in the tort context, "liability attaches only" when there is "a duty to exercise reasonable care in making disclosures to the other," and that Walmart did not "owe[] [Mr. Merck] any such duty." Op. and Order, R. 114, PageID#2603. Yet subpart A imposes just such a duty of disclosure, one that is closely related to common law duties, such as the duty to correct misleadingly incomplete information. Indeed, the incomplete report Mr. Merck received gave the misleading impression that his misdemeanor was the reason the offer was revoked, rather than his having failed to report it. More fundamentally, *TransUnion*'s analysis does not require an analogy between the "scope of liability" under the statute and the common law, but rather the more focused question of whether the statute targets "the same kind of *harm* that common law courts recognize." *Dickson*, 69 F.4th at 344 (emphasis added). And the district court gave no doctrinal explanation for rejecting the analogy to contract rescission.

24

**ARGUMENT**

I. **Mr. Merck suffered a paradigmatic informational injury because Walmart's failure to tell him the true reason it didn't hire him had adverse effects.**

Mr. Merck suffered a paradigmatic informational injury from Walmart's failure to provide him with the report containing the real reason his conditional job offer was revoked. Both the Supreme Court and this Court have long recognized that failures to disclose information constitute an injury-in-fact when that nondisclosure has an adverse effect on a person's interests. Establishing informational injury is not a high bar, and it is easily met here. Walmart's violation of the FCRA deprived Mr. Merck of the ability to understand a consequential decision made against him, as well as the opportunity to use that information to advocate for himself in both the initial hiring process and his reapplications. That is more than enough for Article III purposes.

**A.** The failure to disclose information that a defendant has a statutory duty to provide constitutes a concrete injury when that failure has adverse effects or downstream consequences for an individual.

**1.** The Supreme Court has long recognized that the de facto harm of a denial of information can be concrete when someone is denied information to which they are entitled by law. The Court has explained that plaintiffs suffer a "concrete and particular" harm when they are unable "to obtain information … that, on

[plaintiffs'] view of the law, the statute requires that [an entity] make public." *Akins*, 524 U.S. at 21. For example, in *Akins*, 524 U.S. 11, and *Public Citizen*, 491 U.S. 440, groups and activists had standing to challenge the failure to disclose information that they wanted to use to better understand the political process and for advocacy. *See also Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 539, 544–45 (6th Cir. 2004) (denial of information required by statute was concrete harm); *Ohio v. Raimondo*, 848 F. App'x 187, 188 (6th Cir. 2021) (same). Nor is this limited to statutes, as there are longstanding disclosure and notice requirements in the common law, *see, e.g.*, *Grae*, 57 F.4th at 569; *see also infra* 44–48 (describing various common law claims for failures to disclose information), and the Constitution, *see infra* 39–43 (describing traditional notice requirements). In all such cases, a particular individual is denied information to which they have a specific legal entitlement.

For such a denial of information to rise to the level of an Article III injury, however, it must also have some adverse effect or downstream consequences. "[T]he mere denial of information is insufficient to support standing." *Grae*, 57 F.4th at 569. In *TransUnion*, the Court explained that "[a]n asserted informational injury" requires some "adverse effects." 592 U.S. at 442. In doing so, however, "*TransUnion* did not work a 'sea change'—it 'simply reiterated the lessons of prior cases'" that some "'adverse effects or other downstream consequences'" are required. *Grae*, 57 F.4th at 570 (quoting *Kelly*, 47 F.4th at 214).

Thus, in the wake of *TransUnion*, "to state a cognizable informational injury a plaintiff must allege [1] that they failed to receive required information, and [2] that the omission led to adverse effects or other downstream consequences." *Id.* (quoting *Kelly*, 47 F.4th at 214).

**2.** These adverse effects or downstream consequences need not rise to the level of a standalone Article III injury. As this Court has explained, it should not be "difficult to define 'adverse effects.'" *Id.* at 571. "In determining whether an informational injury is sufficiently concrete, the universe of interests that will create a 'plus' is larger than those that would support standing on their own." *Am. Canoe Ass'n*, 389 F.3d at 546. A plaintiff thus need only show "at least that the information had 'some relevance' to *her*." *Brintley*, 936 F.3d at 493. In other words, all "that a plaintiff 'must show [is] that he has an interest in using the information beyond bringing his lawsuit.'" *Grae*, 57 F.4th at 571 (quoting *Harty*, 28 F.4th at 444).

This Court's caselaw closely tracks that of other circuits. "In the wake of *TransUnion*," the "Courts of Appeals have likewise concluded that 'deprivation of information to which one is legally entitled' constitutes a sufficiently concrete informational injury when that omission causes 'adverse effects' and the information has 'some relevance' to an interest of the litigant that the statute was intended to protect." *Kelly*, 47 F.4th at 213 (quoting *Laufer v. Looper*, 22 F.4th 871, 880–81 & n.6 (10th Cir. 2022)). For example, after *TransUnion*, the Tenth Circuit favorably cited this

Court's earlier pre-*TransUnion* articulation of the standard. *Looper*, 22 F.4th at 881 & n.6 (plaintiffs must show that "the information the plaintiffs sought had 'some relevance' to them" (citing *Brintley*, 936 F.3d at 493)). And "[i]n the FCRA context in particular," the "circuits have found non-disclosure a sufficiently concrete injury where it prevented the plaintiff from receiving fair and accurate reporting of their credit information, or affected their ability to obtain the information they needed to cure their credit issues, or ultimately resolve those issues." *Kelly*, 47 F.4th at 213–14 (citing cases).

The Supreme Court's decisions illustrate this basic principle. The adverse effects in *Akins* were the denial of information about a donor group that would generally help activists "evaluate candidates for public office." 524 U.S. at 21. In *Public Citizen*, an advocacy group sought records of "the ABA Committee's meetings … to monitor its workings and participate more effectively in the judicial selection process." 491 U.S. at 449. "[I]n both cases," this was enough to show that "the information the plaintiffs sought had 'some relevance' to them." *Looper*, 22 F.4th at 881; *see also Grae*, 57 F.4th at 570–71.

**B.** Mr. Merck has comfortably satisfied both factors required for informational harms.

**1.** To start, Mr. Merck undoubtedly "failed to receive required information." *Grae*, 57 F.4th at 570. This is a kind of harm that the Supreme Court and other courts

have long recognized as cognizable under Article III. *See, e.g.*, *Pub. Citizen*, 491 U.S. 440; *see also supra* 25–26. As the district court itself recognized, "[s]ubpart A requires not just '**any** report' or '**a** report'; rather, the employer is required to provide an applicant a copy of '**the** report' that forms the basis, in whole or in part, of its decision not to hire that applicant." Order Denying Mot. to Dismiss, R. 37, PageID#299. That unequivocally did not happen here.

**2.** There are also three concrete ways in which "the omission led to adverse effects or other downstream consequences." *Grae*, 57 F.4th at 570.

*First*, this information would have helped Mr. Merck to understand what had gone wrong in his own employment process. Because Mr. Merck was never given the full consumer report—which would have included the R3 code—he was left in the dark about the real reasons for Walmart's decision and was limited in his ability to uncover more information. Op. and Order, R. 114, PageID#2593. Without the code, his attempt to call and figure out what happened was fruitless. *Id.* This easily establishes "an interest in using the information beyond bringing his lawsuit." *Grae*, 57 F.4th at 571. As any job applicant can attest, it's important to know why your application was rejected—especially when things had been going very well up until that point. A job applicant's personal interest in understanding what went wrong with his own job application is considerably more concrete and particularized than

knowing what happened at an ABA committee meeting on an issue of general public interest. *See Pub. Citizen*, 491 U.S. at 449.

*Second*, Walmart's violation of subpart A had the adverse effect of hindering Mr. Merck's ability to advocate for himself during his 2016 application process. If Mr. Merck had known that his failure to report the misdemeanor he'd forgotten was the reason the offer was revoked, he could have addressed that issue more directly and provided context. Instead, the incomplete report left him guessing as to what happened and how to explain himself. A job applicant clearly has an interest in being able to advocate for his own hiring. This is at least as concrete as information allowing an advocacy group to "participate more effectively in the judicial selection process"—an interest that has been held sufficient regardless of whether the participation would have moved the needle at all. *Pub. Citizen*, 491 U.S. at 449; *see also Akins*, 524 U.S. at 21 (holding that denial of information activists wished to use to engage in advocacy efforts was sufficiently concrete for Article III purposes).

*Third*, Mr. Merck had an interest in the information to inform subsequent job applications with Walmart. Armed with the relevant information regarding the R3 code, he could have attempted to explain in future applications that he had forgotten about his 15-year-old misdemeanor. Before the background check, Mr. Merck was told "that everything looked really good" and there was no reason he "would not be hired," yet he wasn't even given an interview after submitting his reapplications.

Summ. J. Opp'n Ex. C, R. 105-3, PageID#2267. Indeed, the district court acknowledged that it was possible that Mr. Merck had not reached the interview stage in his reapplications because staff at the Walmart location knew he had failed a previous background check—something that Mr. Merck could have explained. Op. and Order, R. 114, PageID#2604. Yet the district court improperly failed to "draw [this] reasonable inference[]" in favor of Mr. Merck as the party opposing summary judgment. *McKay*, 823 F.3d at 866. Here again, Mr. Merck suffered the informational harm of being deprived of information that would have allowed him to advocate in a more informed way. *See Pub. Citizen*, 491 U.S. at 449; *see also Akins*, 524 U.S. at 21.

Each of these adverse effects satisfies the relaxed standard established by the Supreme Court and this Court's informational harm jurisprudence.

**C.** The district court reached the contrary conclusion based on a fundamentally mistaken understanding of the controlling legal framework. According to the district court, under *TransUnion* and this Court's decision in *Ward*, Mr. Merck needed to show "an independent concrete injury flowing from Walmart's" nondisclosure—specifically, he needed to show that not being given the report cost Mr. Merck the job. Op. and Order, R. 114, PageID#2603, 2605. Yet if that were right, the entire doctrine of informational harms would become illusory, as such harms could only qualify so long as there was an independent Article III

injury-in-fact. This heightened standard has no basis in the caselaw either before or after *TransUnion*, and *Ward* did not even discuss the informational-harm doctrine. 9 F.4th at 361. Indeed, if this were the law, it would usher in the very "sea change" that *TransUnion* did not effect. *Grae*, 57 F.4th at 570. In short, the district court got it right the first time, and neither *TransUnion* nor this Court's pre-*Grae* decision in *Ward* altered the law on informational harms.

## II. Because Walmart's unlawful decisionmaking process resulted in concrete harm, Mr. Merck was not required to show that the outcome would have been different but for the FCRA violation.

The district court also ran afoul of controlling precedent from the Supreme Court and this Court by requiring Mr. Merck to show that Walmart's procedural violation was the reason his conditional job offer was revoked. As the Supreme Court recently explained, when a defendant makes a decision without following statutory procedures and a plaintiff is harmed by that decision, Article III does not require her to show that following the correct procedures would have led to a different outcome. *See Brown*, 600 U.S. at 561. Disregarding this principle, the district court held that Mr. Merck would have standing only if he could show that "the statutory violation was a *but-for cause* of the adverse employment action." Op. and Order, R. 114, PageID#2605 (emphasis added). That was error. Mr. Merck has standing to challenge Walmart's FCRA violation without showing that Walmart would have come to a different conclusion had it complied with the FCRA.

**A.** It is well established that "when a statute affords a litigant a procedural right to protect his concrete interests," he does not need to show that the procedural violation was a but-for cause of harm to those concrete interests. *Brown*, 600 U.S. at 561. With challenges to unlawful decisionmaking procedures, "it is enough to show that the procedural step was connected to the substantive result," such as if an "application was denied through an allegedly [unlawful] process." *Rice*, 30 F.4th at 593.

The Supreme Court recently illustrated this principle with a familiar example. Consider "a person living adjacent to the site for proposed construction of a federally licensed dam" whose property would be harmed by the dam and who is challenging "the licensing agency's failure to prepare an environmental impact statement" before allowing the dam project to move forward. *Brown*, 600 U.S. at 561. In this situation, the legal violation is procedural in nature—the agency failed to follow a statutorily required step before taking action. But, crucially, the landowner need not show that requiring the agency to prepare an environmental impact statement would have prevented the impending harm to his property. To the contrary, the landowner has standing "even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered." *Id.* That's because, "[w]hile it might be uncertain whether undertaking an environmental impact statement would prevent

the dam from being built, it is clear that building the dam would directly injure the landowner." *Id.* at 566.

So too here. Subpart A imposes a set of procedural protections to safeguard a job applicant's concrete interests in employment decisions. In other words, Congress "afford[ed] a litigant a procedural right to protect his concrete interests" in employment. *Id.* at 561. So, just like the landowner injured by the decision to license the dam, Mr. Merck suffered concrete economic harm from Walmart's decision to revoke his conditional job offer. And once Mr. Merck has identified this concrete harm from Walmart's decision, "the fact that [Walmart] might well come to the same decision after abiding by the contested procedural requirement does not deprive [him] of standing." *Id.* at 561–62.

**B.** The district court avoided this straightforward principle of Article III standing and instead imposed the exact causation standard this Court has said is not required. In the context of procedural violations, this Court has made clear that a plaintiff "need not show that *but for* the alleged procedural deficiency the [defendant] would have reached a different substantive result." *Rice*, 30 F.4th at 593 (emphasis added); *see also Wright v. O'Day*, 706 F.3d 769, 771–72 (6th Cir. 2013) ("[I]t is clear from Supreme Court cases that a litigant can suffer an injury-in-fact from the denial of procedural protections even if, when applied, the procedures might not result in relief."). Yet according to the district court, "a violation of the FCRA's pre-adverse

34

action notice requirements does not result in concrete harm unless … the statutory violation was a *but-for cause* of the adverse employment action." Op. and Order, R. 114, PageID#2605 (emphasis added). On this reading, a plaintiff must show that the deprivation of notice of their consumer report and a chance to address the negative information caused their loss of employment.

To return to the Supreme Court's example, this would be like requiring the landowner to show, for Article III standing purposes, that the agency's failure to prepare an environmental impact statement was the but-for cause of the dam being built. That would obliterate longstanding caselaw on procedural violations that serves, among other things, to protect individuals harmed by decisions reached through improper procedures. *See, e.g.*, *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 95 (D.C. Cir. 2002) ("If a party claiming the deprivation of a right to notice-and-comment rulemaking under the APA had to show that its comment would have altered the agency's rule, section 553 would be a dead letter.").

Fortunately, that is not the law. Instead, it is enough for standing that the "application was denied through an allegedly [unlawful] process." *Rice*, 30 F.4th at 593. Here, Mr. Merck's job application was denied after a process that violated the FCRA, leaving him without notice of the true reason his offer was being revoked and the opportunity to respond. The fact that Mr. Merck's "application was subject to

… [an] allegedly [unlawful] process and its outcome" affected Mr. Merck economically is sufficient for "demonstrat[ing] injury-in fact." *Rice*, 30 F.4th at 591.

**C.** The district court's misapprehension of the legal standard also colored its analysis of Mr. Merck's reapplications. The court concluded that, while there was a "possibilit[y]" "that Walmart's alleged FCRA violation resulted in his [subsequent] August and November applications being denied," Mr. Merck had not "demonstrated" that the violation caused the denials. Op. and Order, R. 114, PageID#2604. Once again, the district court improperly failed to draw this reasonable inference in Mr. Merck's favor on summary judgment. *McKay*, 823 F.3d at 866. Even putting that aside, however, this is just the same causal mistake as before. It was enough that Walmart violated the FCRA's procedural protections for job applicants and that Mr. Merck suffered a concrete harm in the form of a denied job. Mr. Merck simply did not need to prove that Walmart's procedural violation was the reason his reapplications were denied.

**III. Congress appropriately granted Mr. Merck the right to sue for harms that have a close relationship to traditional harms recognized by the Constitution and the common law.**

Even if the above informational and economic harms were somehow not sufficient under Article III—and they are—these are not the only ways in which Mr. Merck's injury from Walmart's unlawful conduct is cognizable under Article III. "Congress may elevate to the status of legally cognizable injuries concrete, *de facto*

injuries that were previously inadequate in law." *TransUnion*, 594 U.S. at 425. In this analysis, "both history and the judgment of Congress play important roles." *Spokeo*, 578 U.S. at 340. Congress appropriately exercises its judgment when it elevates injuries that bear a close relationship to traditionally recognized harms. These traditional harms can be found in both constitutional and common law history.

In this case, a violation of subpart A's requirement of pre-deprivation notice and an opportunity to heard bears a close relationship to a violation of protections under the common law as well as procedural due process—which affords similar protections in many public employment contexts. In addition, a close relationship exists between an employer's violation of subpart A by failing to disclose material information and traditional tort and contract claims. Congress thus appropriately exercised its judgment to grant individuals the ability to sue for such harms.

## A. Courts must give due weight to Congress's conclusion that a violation of subpart A is harmful.

Beginning with the judgment of Congress, there can be little doubt that, in enacting subpart A, Congress concluded that a violation of the provision was harmful. "Courts must afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation of that statutory prohibition or obligation." *TransUnion*, 594 U.S. at 425. Through subpart A, "Congress granted the consumer a right to receive a copy of his report before adverse action is taken, and

provided for statutory damages plus attorney's fees for willful noncompliance," "which clearly illustrates that Congress believed that th[is] violation of FCRA causes a concrete harm to consumers." *Long*, 903 F.3d at 323–24.

Congress's conclusion was understandable. Subpart A serves the FCRA's core goals of ensuring both "[a]ccuracy and fairness" in the use of consumer reports in the particularly important context of employment decisions. § 1681(a)(4); *see also supra* 5–7. Congress recognized that it would be unfair for someone to be fired or have a job offer revoked based on secret information in her consumer reports that she'd never seen or had the chance to address. *See Robertson*, 902 F.3d at 695–97; *Long*, 903 F.3d at 317–19.[3] This conclusion was consistent with the Supreme Court's own recognition—reached a decade earlier—of the "obvious value" of granting "some opportunity for the employee to present his side of the case," "[e]ven where the facts are clear." *Cleveland Bd. of Educ.*, 470 U.S. at 543. And the Supreme Court had similarly already concluded that the lack of notice and an opportunity to be heard

_____

[3] While a few courts have advocated a different reading of subpart A that focuses only on the accuracy of the information, those opinions "fail[ed] to grapple with the textual grounding of the holdings in *Robertson* and *Long*." *Azeez v. Lifespan Corp.*, 635 F. Supp. 3d 75, 84 (D.R.I. 2022) (citing *Schumacher v. SC Data Ctr., Inc.*, 33 F.4th 504, 511 (8th Cir. 2022)). Instead, they placed significant weight on legislative history. *See Schumacher*, 33 F.4th at 511; *Walker v. Fred Meyer, Inc.*, 953 F.3d 1082, 1094 (9th Cir. 2020). Yet this Court is more cautious about the "venture" of "examining legislative history to interpret statutory text." *Jones v. Bottom*, 85 F.4th 805, 817 (6th Cir. 2023). And the weight of the caselaw remains firmly on the side of the Third and Seventh Circuits. *See Azeez*, 635 F. Supp. 3d at 84 (citing cases).

entitles an individual to a remedy, even when the individual cannot show any further injury. *Carey*, 435 U.S. at 266–67, 266 n.23.

**B. There is a close relationship between the harm to Mr. Merck from Walmart's violation of subpart A and the traditionally recognized harm of denial of pre-deprivation notice and the opportunity to be heard.**

Turning to the historical inquiry, it asks "whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 591 U.S. at 414. The answer here is yes. The harm Mr. Merck suffered—lack of notice of negative information about him and the opportunity to address that information before Walmart took an adverse employment action against him—bears a close relationship to the traditionally recognized harm of the denial of pre-deprivation notice and an opportunity to be heard. The Supreme Court has even recognized that a person is harmed when a public employer denies him a pre-deprivation opportunity to explain that he had misremembered a past criminal conviction. That is a close relationship indeed.

**1.** Traditionally recognized harms are not limited to physical or monetary harm but include "various intangible harms." *TransUnion*, 591 U.S. at 414, 425. Examples of "traditional" intangible harms can come from the common law, but also encompass "harms specified by the Constitution itself," such as the "abridgment of free speech" or the "infringement of free exercise." *Id.* at 425 (citing cases); *see also Spokeo*, 578 U.S. at 340 (harms to "free speech" and "free exercise" are quintessential

39

examples of "intangible injuries" than "can nevertheless be concrete"). To illustrate, *TransUnion* offered "discriminatory treatment" as an example of how "Congress may elevate … injuries that were previously inadequate in law." 591 U.S. at 425–426 (citing *Allen v. Wright*, 468 U.S. 737, 757, n. 22 (1984)).

That makes sense. Anything less and Congress would be disabled from guaranteeing statutory protections for some of our most cherished rights, including the free exercise of religion, free speech, and antidiscrimination. *See, e.g.*, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982) (discriminatory treatment under the Fair Housing Act gave rise to standing). Congress has often determined that it is appropriate to provide protections for such rights above and beyond those specifically provided by the Constitution. For example, Title VII of the Civil Rights Act requires private employers to offer reasonable accommodations for religious beliefs. *See, e.g.*, *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 771 (2015). And the Religious Freedom Restoration Act established statutory protections for religious exercise that are expressly broader than those under the Supreme Court's jurisprudence on the Free Exercise Clause. *See, e.g.*, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694–96 (2014).

**2.** In addition, when drawing an analogy between a statutory harm and a traditionally recognized harm, courts "do not require an exact duplicate." *TransUnion*, 591 U.S. at 424, 433. As this Court has explained, relying on an opinion

by then-Judge Barrett, the historical analysis "look[s] for a 'close relationship' *in kind, not degree.*" *Dickson*, 69 F.4th at 344 (quoting *Gadelhak*, 950 F.3d at 462–63). For example, falsity has long been built into the nature of defamation. *See, e.g.*, Restatement (First) of Torts § 558 (1938) ("To create liability for defamation there must be an unprivileged publication of false and defamatory matter."). Yet Congress could appropriately grant someone standing to sue over a statement that gave the wrong impression but was not actually false. *TransUnion*, 591 U.S. at 433.

**3.** Walmart's violation of subpart A bears a remarkably close relationship in kind to the denial of notice and an opportunity to be heard before adverse action is taken against someone—a traditionally recognized harm.

The Constitution's guarantee of procedural due process has long been understood to ensure both notice of allegations against a person and that person's opportunity to be heard in their own defense. "The core of due process is the right to notice and a meaningful opportunity to be heard." *Erickson*, 522 U.S. at 266; *see also Anderson Nat'l Bank v. Luckett*, 321 U.S. 233, 246 (1944) (same). As the Supreme Court has explained, a decision taken against someone without "notice at a meaningful time and in a meaningful manner that would have given him an opportunity to be heard" would be "contrary to the most basic tenets of due process." *Peralta v. Heights Med. Ctr., Inc.*, 485 U.S. 80, 86–87 (1988). This understanding traces its roots as far back as "the fundamental principle contained in chapter twenty-ninth of Magna

Charta" that due process requires "notice" and "a day in court to make [a] defence." *Rees v. City of Watertown*, 86 U.S. 107, 122 (1873). Even in the nineteenth century, courts observed that such a principle "is so elementary that it must be known to all persons in the profession." *Gilmore v. Sapp*, 100 Ill. 297, 304 (1881).

The common law has traditionally offered similar protections. These included not just notice of allegations against you, but the opportunity to admit the technical truth of those allegations while offering a response through "the 'confession and avoidance' option that existed at common law." *Robertson*, 902 F.3d at 696 (quoting Charles A. Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 1270 (3d ed. 2017)).

This principle also has long extended to the employment context. The Supreme Court has recognized that, in many cases, an individual's possible loss of public employment must "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ.*, 470 U.S. at 542. This reflects "the severity of depriving a person of the means of livelihood," along with the fact that the opportunity for someone to present her case is crucial for reaching an informed, appropriate, and fair decision. *Id.* at 543. And as with subpart A, this is true even in cases "where the facts are clear"—even then, an individual should still have the chance to provide context and her "side of the case." *Id.* Fairness requires no less.

This type of deprivation of due process bears a close relationship in kind with what happened to Mr. Merck. As another panel including then-Judge Barrett pointed out, subpart A is analogous to both common law rights and procedural due process protections in the public employment context. *See Robertson*, 902 F.3d at 695–96. Indeed, the Supreme Court has even vindicated the procedural due process rights of an individual who had failed to disclose a criminal conviction on his job application and lost his job without "an opportunity to respond to the charge of dishonesty." *Cleveland Bd. Of Educ.*, 470 U.S. at 535. In that case, the plaintiff argued that, had he been given that opportunity to be heard, he would have explained that he had misremembered the nature of the offense. *Id.* at 536. Just so here. Mr. Merck clearly suffered "the same *kind* of harm" as in such cases. *Dickson*, 69 F.4th at 344.

**4.** The harm from a deprivation of notice and an opportunity to be heard has long been understood as a sufficient basis for a suit. Drawing on how "[c]ommon-law courts traditionally" dealt with such rights, the Supreme Court has held that "the denial of procedural due process [is] actionable for nominal damages without proof of actual injury." *Carey*, 435 U.S. at 266–67, 266 n.23 (citing Dan D. Dobbs, *Law of Remedies* § 3.8, 191–193 (1973); Charles T. McCormick, *Handbook on the Law of Damages* §§ 20–22 (1935); Restatement (First) of Torts § 907).

This is true "even if" the ultimate decision reached by the flawed procedures was "justified." *Id.* at 266. During the same Term as *TransUnion*, the Court singled

43

out deprivations of "procedural due process" as an example of a harm that could be vindicated at common law without a showing of further harm. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 800 (2021) (citing *Carey*, 435 U.S. at 266–267). Thus, a plaintiff can be awarded "nominal damages" when an employer "did violate [the plaintiff's] constitutional right to due process by failing to provide him with an adequate pre-deprivation hearing," but "this failure did not ultimately lead to" any other harm. *See, e.g.*, *Kerber v. Wayne Cnty. Emps. Ret. Sys.*, 2021 WL 2795802, at *9 (6th Cir. Aug. 2, 2021).[4]

### C.   There is also a close relationship between Walmart's failure to disclose material information and common law tort and contract claims.

In addition to these harms from the deprivation of notice and an opportunity to be heard, there are also common-law analogues to the harm Mr. Merck suffered from Walmart's failure to disclose. The common law recognized a range of claims based on failures to disclose material information, such as in the course of a business transaction. The harm caused by Walmart's violation of subpart A bears a close relationship in kind to these sorts of claims.

---

[4] To be sure, other procedural violations may not bear a sufficiently close relationship to bedrock features of due process. Take the failure in *TransUnion* "to follow reasonable procedures to ensure the accuracy of credit files." 594 U.S. at 430. That is considerably further afield from protections enshrined in the Magna Carta and long safeguarded by the common law. As a result, many of the FCRA's procedural protections may be unlikely to qualify. But subpart A is not newfangled. It bears the familiar hallmarks of age-old procedural guarantees.

**1.** There are longstanding tort and contract claims that arose from a defendant's nondisclosure of material information during a business transaction or similar circumstances.

*First*, there are several analogous torts. A tort claim lay when someone "fail[ed] to disclose to another a [material] fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction." Restatement (Second) of Torts §§ 551(1), 538. Here, Walmart did not disclose to Mr. Merck the true reason why his offer was revoked, which could justifiably have caused Mr. Merck to refrain from trying to explain that he had failed to report the misdemeanor conviction because he had forgotten it. Similarly, a tort claim would lie for "[a] representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter." Restatement (Second) of Torts § 529. Here again, Walmart provided a copy of the report that would misleadingly appear complete, but was in fact missing the true reason Mr. Merck's job offer was revoked. Finally, Walmart obtained Mr. Merck's protected personal information pursuant to certain conditions about how it can be used, then used this information while failing to comply with those conditions. *See Long*, 903 F.3d at 324 (citing Restatement (Second) of Torts § 652A(2)(a)-(d)).

*Second*, misrepresentations are grounds for the rescission of a contract. *See* Restatement (Second) of Contracts § 164(1). Similar rules exist for undoing transfers.

*See* Restatement (Third) of Restitution and Unjust Enrichment § 13(1). The remedy of rescission was available even if no harm could be shown. *Id.*

These longstanding claims all rest upon the same principle: That it is harmful to be denied material information in the course of a business transaction or similar circumstances. That is the same kind of harm that Mr. Merck suffered here. Mr. Merck "need not" show that he could "make out a claim" in tort or contract law based on Walmart's FCRA violation. *Dickson*, 69 F.4th at 348. Nor does Mr. Merck need to show that the harm he suffered from Walmart's nondisclosure was of the same "*degree*" as the harm that is the basis of these common law claims. *Id.* It is sufficient that the harm here is "closely related to the *kind* of harm protected at common law by" these claims. *Dickson*, 69 F.4th at 344.

**2.** The district court ducked this analogy on irrelevant grounds. As to tort claims, the district court said that "such liability attaches only" when there is "a duty to exercise reasonable care in making disclosures to the other." Op. and Order, R. 114, PageID#2603. The district court then puzzlingly asserted that Walmart did not "owe[] [Merck] any such duty"—without engaging with the clear statutory duty to make timely and accurate disclosures. Op. and Order, R. 114, PageID#2603. Compounding this, the district court asserted without citation that unspecified "[s]imilar deficiencies" barred analogies to common law contract claims. *Id*. This was incorrect in several ways.

As an initial matter, the district court mistakenly required a close relationship between Mr. Merck's harm and every element of the common law cause of action. But the operative question is whether there is "the same kind of *harm* that common law courts recognize," not whether the "scope of liability" is the same. *Dickson*, 69 F.4th at 344. *TransUnion* could not have made this clearer: the analysis is whether "the asserted *harm* has a 'close relationship' to a *harm* traditionally recognized as providing a basis for a lawsuit." 594 U.S. at 414 (emphases added). The Supreme Court's method of analysis also illustrates this: "The *harm* from being labeled a 'potential terrorist' bears a close relationship to the *harm* from being labeled a 'terrorist.' In other words, the *harm* from a misleading statement of this kind bears a sufficiently close relationship to the *harm* from a false and defamatory statement." *Id.* at 433 (emphases added). The Court also noted that "physical harm" and "monetary harm" are sufficient for standing, *id*. at 417, even though neither of those harms standing alone is a full cause of action. Indeed, this entire body of law is founded on the distinction between "a cause of action" or legal duty and "a concrete harm." *Id.* at 426.

But even if a duty to disclose were required, the FCRA provides just such a duty. The district court never explained why the FCRA's duty to provide the consumer report before making an adverse employment determination was not analogous to the "duty to exercise reasonable care to disclose to the other before the

transaction is consummated." Restatement (Second) of Torts § 551(2). Additionally, a person has a duty to disclose "matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." Restatement (Second) of Torts § 551(2)(a). In this case, Walmart had access to Mr. Merck's consumer report because he consented to the company accessing the information subject to strict statutory rules, including the duty to disclose. *See* § 1681b(b)(1)(A)(i). Subpart A thus creates an analogous framework where Mr. Merck was "entitled to know" what was in the consumer report because he had consented to Walmart accessing that otherwise private information. Restatement (Second) of Torts § 551(2)(a). Finally, there is a common law duty to disclose "matters known to [a person] that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading." Restatement (Second) of Torts § 551(2)(b). In this case, Walmart's incomplete disclosure was misleading because it falsely seemed to provide the full report on which Walmart made its decision.

In sum, the harm Mr. Merck suffered from a violation of subpart A bears a close relationship to traditionally recognized injuries with sources in both constitutional law and the common law. It was well within Congress's power to elevate these injuries to injuries in fact under Article III.

## CONCLUSION

The district court's decision should be reversed.

Respectfully submitted,

*/s/ Matthew W.H. Wessler*
MATTHEW W.H. WESSLER
THOMAS SCOTT-RAILTON
GUPTA WESSLER LLP
2001 K Street NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*

E. MICHELLE DRAKE
JOSEPH C. HASHMALL
BERGER MONTAGUE PC
1229 TYLER STREET, N.E.
SUITE 205
MINNEAPOLIS, MN 55413
(612) 594-5933

BETH E. TERRELL
ELIZABETH ADAMS
TERRELL MARSHALL LAW GROUP
PLLC
936 North 34th Street, Suite 300
Seattle, WA 98103
(206) 816-3528

January 16, 2024                    *Counsel for Plaintiff-Appellant*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 12,085 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

January 16, 2024

/s/ Matthew W.H. Wessler
Matthew W.H. Wessler

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Sixth Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Matthew W.H. Wessler*
Matthew W.H. Wessler

# ADDENDUM:
## DESIGNATION OF DISTRICT COURT DOCUMENTS

| Docket No. | Description | PageID |
|:---:|:---|:---:|
| 16 | First Amended Complaint | 74–89 |
| 16-1 | Exhibit 1- First Amended Complaint | 90–91 |
| 37 | Order Denying Defendant's Motion to Dismiss | 284–302 |
| 102 | Defendant Walmart Inc.'s Opposition to Plaintiff's Motion for Class Certification | 1859–1906 |
| 105-1 | Summary Judgment Opposition Exhibit A- Bartlett Excerpts | 2118–2155 |
| 105-3 | Summary Judgment Opposition Exhibit C- Full Thomas Merck Deposition | 2183–2347 |
| 114 | Opinion and Order Granting Walmart Inc.'s Motion for Summary Judgment and Denying Motion for Class Certification as Moot | 2590–2606 |
| 116 | Plaintiff's Notice of Appeal | 2608-2609 |