No. 23-3698

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

THOMAS MERCK, individually and as a representative of the class,

*Plaintiff-Appellant*,

v.

WALMART, INC.,

*Defendant-Appellee.*

---

*On Appeal from the United States District Court
for the Southern District of Ohio*

---

## BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER
## AS *AMICUS CURIAE* IN SUPPORT OF
## PLAINTIFF-APPELLANT AND REVERSAL

---

Elizabeth B. Wydra
Brianne J. Gorod
Miriam Becker-Cohen
CONSTITUTIONAL ACCOUNTABILITY
    CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-3698 _____     Case Name: Thomas Merck v. Walmart, Inc.

Name of counsel: Brianne J. Gorod

Pursuant to 6th Cir. R. 26.1, Constitutional Accountability Center
*Name of Party*

makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

No

---

CERTIFICATE OF SERVICE

I certify that on _____ January 23, 2024 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Brianne J. Gorod
Brianne J. Gorod
Constitutional Accountability Center

---

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................... ii

INTEREST OF *AMICUS CURIAE* ...................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................ 1

ARGUMENT ..................................................................................... 6

  I.   Intangible Injuries that Are Closely Related to Constitutional Harms Are "Concrete" Under Article III ............................................... 6

  II.  15 U.S.C. § 1681b(b)(3)(A) Creates a Cause of Action for Injuries that Are Analogous to the Harm Arising out of the Denial of Procedural Due Process .............................................................................. 11

  III. Injuries Caused by the Denial of Procedural Due Process Are Concrete Without Any Showing that the Adverse Action Itself Was Erroneous, and So Are Injuries Like Merck's that Arise out of Violations of 15 U.S.C. § 1681b(b)(3)(A) ......................................................... 16

CONCLUSION .................................................................................. 24

i

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Am. Premier Underwriters, Inc. v. Nat'l R.R. Passenger Corp.*,
     839 F.3d 458 (6th Cir. 2016) .......................................................... 17

*Baldwin v. Hale*,
     68 U.S. 223 (1863) ......................................................................... 13

*Bank of Columbia v. Okely*,
     17 U.S. 235 (1819) ......................................................................... 12

*Burwell v. Hobby Lobby Stores, Inc.*,
     573 U.S. 682 (2014) ....................................................................... 10

*Carey v. Piphus*,
     435 U.S. 247 (1978) ................................................................ *passim*

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*,
     508 U.S. 520 (1993) ......................................................................... 7

*Cleveland Bd. of Educ. v. Loudermill*,
     470 U.S. 532 (1985) ................................................................ *passim*

*Coe v. Armour Fertilizer Works*,
     237 U.S. 413 (1915) ....................................................................... 21

*Dickson v. Direct Energy, LP*,
     69 F.4th 338 (6th Cir. 2023) ..................................................... 12, 15

*Dutta v. State Farm Mut. Auto. Ins. Co.*,
     895 F.3d 1166 (9th Cir. 2018) ......................................................... 4

*EEOC v. Abercrombie & Fitch Stores, Inc.*,
     575 U.S. 768 (2015) ....................................................................... 11

*Farrar v. Hobby*,
     506 U.S. 103 (1992) ....................................................................... 22

*Franklin v. Aycock*,
     795 F.2d 1253 (6th Cir. 1986) ....................................................... 22

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Fuentes v. Shevin*,
  407 U.S. 67 (1972) ................................................................... 2, 12, 13

*Gadelhak v. AT&T Servs., Inc.*,
  950 F.3d 458 (7th Cir. 2020) ............................................... 12, 15

*Hagy v. Demers & Adams*,
  882 F.3d 616 (6th Cir. 2018) ................................................... 4, 9

*Hammond v. Baldwin*,
  866 F.2d 172 (6th Cir. 1989) ...................................................... 5

*Kennedy v. Bremerton Sch. Dist.*,
  597 U.S. 507 (2022) .................................................................... 11

*Kerber v. Wayne Cnty. Emps. Ret. Sys.*,
  No. 20-1769, 2021 WL 2795802 (6th Cir. Aug. 2, 2021) ...................... 22

*LaChance v. Erickson*,
  522 U.S. 262 (1998) ...................................................................... 2

*Long v. Se. Pa. Transp. Auth.*,
  903 F.3d 312 (3d Cir. 2018) ........................................................ 18

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ...................................................................... 7

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) .................................................................... 13

*Murray's Lessee v. Hoboken Land & Imp. Co.*,
  59 U.S. 272 (1855) ................................................................ 13, 15

*Nasierowski Bros. Inv. Co. v. City of Sterling Heights*,
  949 F.2d 890 (6th Cir. 1991) ................................................... 5, 17

*Pleasant Grove City v. Summum*,
  555 U.S. 460 (2009) ...................................................................... 7

*Raines v. Byrd*,
  521 U.S. 811 (1997) ...................................................................... 3

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Rees v. City of Watertown*,
    86 U.S. 107 (1873) ................................................................. 21

*Robertson v. Allied Sols., LLC*,
    902 F.3d 690 (7th Cir. 2018) ............................................. 14, 18

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ........................................................ 4, 6, 7

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ............................................................ 7, 11

*Sutton v. Cleveland Bd. of Educ.*,
    958 F.2d 1339 (6th Cir. 1992) ............................................... 22

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*,
    576 U.S. 519 (2015) ............................................................. 10

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ...................................................... *passim*

*United States v. James Daniel Good Real Prop.*,
    510 U.S. 43 (1993) ......................................................... 12, 13

*United States v. Texas*,
    599 U.S. 670 (2023) ............................................................... 3

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*,
    529 U.S. 765 (2000) ........................................................... 7, 11

*Zinermon v. Burch*,
    494 U.S. 113 (1990) ............................................................. 17

## STATUTES AND CONSTITUTIONAL PROVISIONS

15 U.S.C. § 1681b(b)(3)(A) ......................................................... 1, 12

15 U.S.C. § 1681b(b)(3)(B) ............................................................. 14

15 U.S.C. § 1681g ........................................................................... 15

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

15 U.S.C. § 1691(d) ....................................................................... 14, 15

42 U.S.C. § 2000bb-1(c) ............................................................... 10

42 U.S.C. § 3601 ........................................................................... 10

U.S. Const. art. 3, § 2, cl. 1 .......................................................... 3


OTHER AUTHORITIES

1 Annals of Cong. (1789)............................................................... 3, 4, 9

Dan B. Dobbs, *Law of Remedies* (1973)...................................... 21

Letter from Thomas Jefferson to James Madison (Mar. 15, 1789),
    *reprinted in* 12 *The Papers of James Madison* (Robert A. Rutland
    & William M. E. Rachal eds., 1975).......................................... 8

Letter from James Madison to Thomas Jefferson (Oct. 17, 1788),
    *reprinted in* 11 *The Papers of James Madison*
    (Robert A. Rutland & William M. E. Rachal eds., 1975)....................... 8

Charles T. McCormick, *Law of Damages* (1935)...................................... 21

*Restatement (First) of Torts* (1939) ............................................... 21

Benjamin J. Shipman, *Handbook of Common-Law Pleading*
    (3d ed. 1923) .......................................................... 13

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history.  CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and preserve the rights and freedoms it guarantees.  CAC has a strong interest in ensuring meaningful access to the courts, in accordance with constitutional text and history, and therefore has an interest in this case.

## INTRODUCTION
## AND SUMMARY OF ARGUMENT

Under 15 U.S.C. § 1681b(b)(3)(A), before an employer may take an adverse action against a job applicant on the basis of a consumer report, "the person intending to take such adverse action shall provide to the consumer to whom the report relates" both "a copy of the report" and "a description in writing of the rights of the consumer."  Walmart violated this provision when it revoked Thomas Merck's job offer without first providing him with a copy of the report that supplied the basis for the revocation.  Congress gave Merck a cause of action to sue for that violation.  The only question is whether Merck's rights under the statute can be adjudicated in a

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to the brief's preparation or submission.  All parties consent to its filing.

1

court of law—that is, whether the undisputed violation of Merck's rights inflicted an injury of the sort traditionally susceptible to judicial resolution. The answer is plainly yes.

The Supreme Court has held that injuries with "a close historical or common-law analogue . . . in American history and tradition" are judicially cognizable for purposes of the standing inquiry. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). By requiring disclosure of a consumer report prior to any adverse action and thereby enabling the applicant to speak with the employer and contextualize the report's contents, 15 U.S.C. § 1681b(b)(3)(A) creates a procedural protection that closely resembles the constitutional right to procedural due process, the "core of [which] is the right to notice and a meaningful opportunity to be heard." *LaChance v. Erickson*, 522 U.S. 262, 266 (1998). These rights date back to Magna Carta, and American courts have adjudicated them for centuries. As the Supreme Court has explained, they have "long been recognized" because "the fair process of decision making that [they] guarantee[] works, by itself, to protect against arbitrary deprivation of property." *Fuentes v. Shevin*, 407 U.S. 67, 81-82 (1972).

The denial of a "fair process of decision making"—here, a process that Congress deemed so important that it required it to take place *prior* to any adverse action—constitutes a critical part of the injury that Merck suffered when Walmart revoked Merck's job offer without providing him with the prior notice required by

Section 1681b(b)(3)(A).  Yet the court below discounted that injury, declaring that "violation of the FCRA's pre-adverse action notice requirements does not result in concrete harm unless the consumer report was inaccurate or the statutory violation was a but-for cause of the adverse employment action."  Op. & Order, Dkt. No. 114, PageID#2605.  That holding is at odds with binding precedent from this Court and the Supreme Court, and it has no basis in Article III.

In *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), the Supreme Court made clear that "injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts" are "concrete" within the meaning of Article III's "Cases" or "Controversies" requirement.  *Id.* at 425; *see* U.S. Const. art. 3, § 2, cl. 1.  "Those traditional harms," the Court explained, may "include harms specified by the Constitution itself."  *TransUnion*, 594 U.S. at 425. After all, constitutional harms have always been viewed as "'capable of resolution through the judicial process,'" the "core principle" of the standing inquiry.  *United States v. Texas*, 599 U.S. 670, 676 (2023) (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)).  Indeed, a chief reason for the codification of a bill of rights was to empower courts to protect against constitutional harms: courts would "resist every encroachment upon rights expressly stipulated for in the constitution by the declaration of rights," 1 Annals of Cong. 457 (1789) (James Madison), and ensure

3

that the guarantees contained in the Bill of Rights were not "paper barriers . . . too weak to be worthy of attention," *id.* at 455.

Because constitutional harms are "concrete" and subject to judicial resolution, Congress may "elevate" injuries that closely resemble constitutional harms "to the status of legally cognizable." *TransUnion*, 594 U.S. at 425 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)).  In doing so, Congress is not "simply enact[ing] an injury into existence," *id.* at 426 (quoting *Hagy v. Demers & Adams*, 882 F.3d 616, 622 (6th Cir. 2018)), but is instead creating a cause of action for a plaintiff to vindicate a "*de facto* injur[y]" traditionally recognized in American courts, *Spokeo*, 578 U.S. at 341.

That is precisely what Congress did when it passed Section 1681b(b)(3)(A): it recognized the harm of being denied notice and an opportunity to be heard when something as important as one's livelihood is on the line and elevated that harm to make it legally cognizable.  While many other statutes create procedural protections for consumers, few bear the hallmarks of the Constitution's procedural due process requirements to the same extent as Section 1681b(b)(3)(A).  In particular, Section 1681b(b)(3)(A)'s mandate that notice be provided *prior* to an adverse action sets it apart from other statutory protections, making it uniquely "akin to pre-deprivation due process." *Dutta v. State Farm Mut. Auto. Ins. Co.*, 895 F.3d 1166, 1175 (9th Cir. 2018).

In *TransUnion*, the Supreme Court also made clear that when a plaintiff is injured by a statutory violation that closely resembles a traditional harm, the contours of that traditional harm should guide analysis of the plaintiff's injury.  Here, that means that procedural due process precedents shed light on the nature of Merck's injury.  And critically, for a plaintiff to suffer a concrete injury within the meaning of the Constitution's Due Process Clauses, the Supreme Court does not require a demonstration of "certain success" if due process had been provided. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 544 (1985).  In fact, "[e]ven where the facts are clear," *id.* at 543, and even where the defendant proves that affording the plaintiff a constitutionally adequate process would *not* have prevented the deprivation of the plaintiff's protected interest, *id.* at 544, the plaintiff is *still* entitled to a judgment in his or her favor, *Carey v. Piphus*, 435 U.S. 247, 266 (1978). It thus follows that a procedural due process plaintiff is injured within the meaning of Article III whenever he or she suffers a deprivation of life, liberty, or property through a constitutionally insufficient process—as this Court has put it, "in the case of a procedural due process claim, 'the allegedly infirm process is an injury in itself.'"  *Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890, 894 (6th Cir. 1991) (quoting *Hammond v. Baldwin*, 866 F.2d 172, 176 (6th Cir. 1989)).

Analogous principles apply here.  For the purpose of assessing Merck's standing, it does not matter whether the information in the consumer report was

accurate. It does not matter how Walmart hypothetically would have responded if Merck had been allowed to explain that his failure to disclose a fifteen-year-old misdemeanor that showed up on his consumer report was an "honest mistake." Op. & Order, Dkt. No. 114, PageID#2605. What matters is that Walmart revoked Merck's job offer without first affording him notice and an opportunity to be heard under 15 U.S.C. § 1681b(b)(3)(A)—that is, the opportunity to review the consumer report and explain or respond to its contents. That was a concrete injury just as it would have been in the analogous procedural due process context, and that is enough to resolve this appeal.

## ARGUMENT

### I.   Intangible Injuries that Are Closely Related to Constitutional Harms Are "Concrete" Under Article III.

For a plaintiff's injury to be cognizable under Article III, it must be "concrete"—that is, "real and not abstract." *Spokeo*, 578 U.S. at 340 (internal quotation marks omitted). Yet "'[c]oncrete' is not . . . necessarily synonymous with 'tangible.'" *Id.* As the Supreme Court explained in *TransUnion*, "intangible harms can also be concrete," and "[c]hief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." 594 U.S. at 425. If an intangible injury is closely related to one of "those traditional harms," Congress may "elevate [it] to the status of legally cognizable,"

even if it was "previously inadequate in law." *Id.* (quoting *Spokeo*, 578 U.S. at 541); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 578 (1992) (similar).

What then constitutes those "intangible" yet "traditional" harms that Congress may elevate? At the most basic level, they are injuries that are "traditionally amenable to, and resolved by, the judicial process." *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 774 (2000) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998)). For instance, in *TransUnion*, the Court explained that injuries such as "reputational harms, disclosure of private information, and intrusion upon seclusion" are concrete precisely because they were historically recognized as being susceptible to judicial resolution in early American courts. 594 U.S. at 425.

And critically, the Court in *TransUnion* also characterized as "traditional harms" those "harms specified by the Constitution itself." *Id.* (citing *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) (abridgment of free speech), and *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993) (infringement of free exercise)). That judgment came straight from *Spokeo, Inc. v. Robins*, an earlier case in which the Court cited the tradition of adjudicating constitutional harms as the chief "confirm[ation] . . . that intangible injuries can nevertheless be concrete." 578 U.S. at 340.

7

Constitutional harms are paradigmatically susceptible to judicial resolution: the Founders enshrined them in our nation's charter for the express purpose of making them enforceable in courts. One of the reasons that the original Constitution did not contain a bill of rights was James Madison's fear of "the inefficacy of a bill of rights on those occasions when its controul is most needed. Repeated violations of these parchment barriers have been committed by overbearing majorities in every State. . . . What use . . . can a bill of rights serve in popular Governments?" Letter from James Madison to Thomas Jefferson (Oct. 17, 1788), *reprinted in* 11 *The Papers of James Madison* 295, 297-98 (Robert A. Rutland & William M. E. Rachal eds., 1975). The answer was judicial review by the independent judiciary the Framers had just created in Article III of the new Constitution. As Thomas Jefferson explained to Madison, "[i]n the arguments in favor of a declaration of rights, you omit one which has great weight with me, the legal check which it puts into the hands of the judiciary." Letter from Thomas Jefferson to James Madison (Mar. 15, 1789), *reprinted in* 12 *The Papers of James Madison*, *supra*, at 13.

This argument had a powerful effect on Madison's thinking. When he introduced the Bill of Rights in Congress in 1789, he declared: "[i]f [these rights] are incorporated into the constitution, independent tribunals of justice will consider themselves in a peculiar manner the guardians of those rights; they will be an impenetrable bulwark against every assumption of power in the legislative or

executive."  1 *Annals of Cong.* 457 (1789).  In other words, to the Framing generation, harms arising out of violations of those protected rights presented "Cases" or "Controversies" susceptible to judicial resolution.

To be sure, in *TransUnion*, the Court grappled with whether the plaintiffs' injuries had a "close relationship" not to a constitutional harm but to a common-law harm—namely, "the reputational harm associated with the tort of defamation"—but that was because the defamation analogy was the only one at play there.  *See* 594 U.S. at 432.  The Court was careful to leave open the possibility that Congress might make legally actionable those injuries that closely resemble constitutional harms as well.  After all, the opinion refers to the need for "a close historical *or* common-law analogue," making clear that analogies to harms in "American history and tradition" are not limited to the common law.  *Id.* at 424 (emphasis added).  Moreover, the Court said that "Congress may elevate" any "concrete, *de facto* injur[y]," and it expressly characterized "harms specified by the Constitution" as fitting that mold. *Id.* at 425 (quotation marks omitted).  Of course, Congress may not "transform something that is not remotely harmful into something that is," *id.* at 426 (quoting *Hagy*, 882 F.3d at 622), but constitutional harms are more than "remotely harmful"—they constitute the archetypical intangible yet real injury in "American history and tradition," *id.* at 424.

9

It is thus unsurprising that Congress has frequently elevated "to actionable legal status," *id.*, harms with close relationships to constitutional harms. The Fair Housing Act, for instance, elevated to the status of legally cognizable an injury with a close relationship to the harm arising out of "[*d*]*e jure* residential segregation by race[,] . . . declared unconstitutional almost a century ago." *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 528 (2015); *see* 42 U.S.C. §§ 3601 *et seq.* In so doing, Congress extended the Constitution's protection against discrimination to certain private housing providers. *Inclusive Communities*, 576 U.S. at 529-30.

The Religious Freedom Restoration Act (RFRA) is another example. Plaintiffs "whose religious exercise has been burdened in violation of [RFRA]," 42 U.S.C. § 2000bb-1(c), have standing for their claims precisely because their harms are closely analogous to those harms arising out of violations of the right to free exercise of religion enshrined in the First Amendment. *See, e.g.*, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 695 & n.3 (2014) (characterizing RFRA claims as similar to constitutional free-exercise claims, yet "provid[ing] even broader protection for religious liberty").

Or imagine that Congress passed a law barring certain *private* actors from interfering with individuals' free exercise of religion—not unlike Title VII of the Civil Rights Act, which requires private employers to offer reasonable

10

accommodations for religious practices, *see, e.g.*, *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 770 (2015).  A plaintiff suing his private employer under such a law for denying him the ability to pray in his office would suffer just as concrete an injury as a public-school football coach denied the ability to pray on the playing field, *see Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022).  That is because the law would "elevate to the status of legally cognizable" an injury with a "close relationship" to the harm arising out of infringement of the First Amendment's Free Exercise Clause.  *See TransUnion*, 594 U.S. at 425.

In sum, the Supreme Court's express guidance in *TransUnion*, the Court's approach to other federal statutes, and perhaps most importantly, the fundamental purpose of the concreteness inquiry itself—to identify those harms that are "traditionally amenable to, and resolved by, the judicial process," *Vt. Agency*, 529 U.S. at 774 (quoting *Steel Co.*, 523 U.S. at 102)—all make clear that injuries that are analogous to constitutional harms are sufficiently concrete for purposes of the standing inquiry under Article III.

## II.    15 U.S.C. § 1681b(b)(3)(A) Creates a Cause of Action for Injuries that Are Analogous to the Harm Arising out of the Denial of Procedural Due Process.

The provision of the Fair Credit Reporting Act (FCRA) at issue here states that "in using a consumer report for employment purposes, *before* taking any adverse action based in whole or in part on the report, the person intending to take such

adverse action" must provide the consumer with "a copy of the report" and "a description in writing of the rights of the consumer."  15 U.S.C. § 1681b(b)(3)(A) (emphasis added).  Section 1681b(b)(3)(A) thus protects against an employer's inappropriate reliance on a consumer report by providing a right to notice of the contemplated basis for the adverse action and an opportunity to be heard before the employer takes the adverse action.  The harm that arises when an employer fails to provide that notice and opportunity to be heard has a "close relationship" to the harm that stems from the denial of procedural due process.  While the harms may not be *identical*, the Supreme Court has never required an "exact duplicate," *TransUnion*, 594 U.S. at 424, and neither has this Court, *see Dickson v. Direct Energy, LP*, 69 F.4th 338, 344 (6th Cir. 2023) ("[W]e are meant to look for a 'close relationship' [to a traditional harm] *in kind, not degree*." (quoting *Gadelhak v. AT&T Servs., Inc*., 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.)).

Much like Section 1681b(b)(3)(A), "[t]he right to prior notice and a hearing is central to the Constitution's command of [procedural] due process." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993).  These requirements are rooted in Magna Carta, *see, e.g.*, *Bank of Columbia v. Okely*, 17 U.S. 235 (1819), and the common law, *see, e.g.*, *Fuentes*, 407 U.S. at 79-80.  For instance, at common law, after receiving notice of allegations, the accused had a right to invoke a "confession and avoidance" defense, whereby he "admits that the declaration shows

12

a good prima facie case; but he alleges *additional* facts which tend to change the legal effect of the allegations admitted."  Benjamin J. Shipman, *Handbook of Common-Law Pleading* § 166, at 300 (3d ed. 1923) (emphasis added).

In the constitutional due process context, though the precise contours of the necessary procedures have always varied by circumstance, the Supreme Court "tolerate[s] exceptions to the general rule requiring predeprivation notice and hearing . . . only in 'extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.'"  *James Daniel*, 510 U.S. at 53 (quoting *Fuentes*, 407 U.S. at 82); *see, e.g.*, *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ("This Court consistently has held that some form of hearing is required *before* an individually is finally deprived of a property interest." (emphasis added)).  This principle was promptly established, and by the time the Fourteenth Amendment extended due process restrictions to state governments, it was deeply entrenched.  *See, e.g.*, *Murray's Lessee v. Hoboken Land & Imp. Co.*, 59 U.S. 272, 280 (1855) ("'[D]ue process of law' generally implies . . . regular allegations, opportunity to answer, and a trial according to some settled course of judicial proceedings."); *Baldwin v. Hale*, 68 U.S. 223, 233 (1863) ("[N]o man shall be condemned in his person or property without notice and an opportunity to make his defence.").

The fact that Section 1681b(b)(3)(A) requires notice *prior* to any adverse action by an employer makes the statutory provision uniquely akin to the constitutional right to procedural due process. Many other federal laws—including other provisions of the FCRA itself—create procedural protections but permit those protections to be implemented *after* an adverse action, or only upon request of the protected party. *Accord Robertson v. Allied Sols., LLC*, 902 F.3d 690, 696 (7th Cir. 2018) (describing the "pre-adverse action requirement" as "unique" among procedural protections).

Perhaps the most salient example is the provision that immediately follows Section 1681b(b)(3)(A): in marked contrast to Section 1681b(b)(3)(A)'s *pre*-adverse action notice requirement, Section 1681b(b)(3)(B) sets up a *post*-adverse action notice regime for those job applicants who apply for positions regulated by the Secretary of Transportation, such as certain truck drivers. *See* 15 U.S.C. § 1681b(b)(3)(B). The provision gives covered employers three days *following* the adverse action to notify an applicant that an adverse decision was made on the basis of a consumer report, *id.* § 1681b(b)(3)(B)(i), and it then gives them an additional three days to provide a copy of the report itself if, and only if, the applicant requests it, *id.* § 1681b(b)(3)(B)(ii).

The Equal Credit Opportunity Act sets up a similar regime: when a creditor takes an "adverse action" against an applicant, such as "a denial or revocation of

credit," the creditor must provide "a statement of reasons for such action."  15 U.S.C.

§ 1691(d).  Yet unlike under Section 1681b(b)(3)(A), the "statement of reasons"—

that is, the notice of the "specific reasons for the adverse action taken," *id.*

§ 1691(d)(3)—may be provided up to thirty days after the adverse action is taken (or

even longer if the applicant does not request it immediately), *id.* § 1691(d)(2)(B).

So too for the provisions of the FCRA that were at issue in *TransUnion*: to the

extent that they required that the consumer be given a copy of his or her credit file

and a summary of rights, those disclosures were not linked in any way to taking an

action against the consumer; they simply had to be provided upon the consumer's

request.  *See* 15 U.S.C. § 1681g(a)(1), (c)(2).  More fundamentally, the deprivation

of a consumer's "right to receive information *in the format required by statute*,"

*TransUnion*, 594 U.S. at 440 (emphasis added), hardly resembles Magna Carta's

age-old due process guarantees, *see Murray's Lessee*, 59 U.S. at 276.  In other words,

unlike Section 1681b(b)(3)(A), the FCRA provisions in *TransUnion* did not bear a

"'close relationship' *in kind*" to the traditional entitlement to notice and an

opportunity to be heard.  *Dickson*, 69 F.4th at 344 (quoting *Gadelhak*, 950 F.3d at

462 (Barrett, J.)).

Congress thus regularly creates procedural rules governing businesses'

interactions with private individuals, yet only those provisions like Section

1681b(b)(3)(A) that bear the hallmarks of traditional procedural due process

protections may be properly classified as Congress's "elevat[ion]" of an injury that closely resembles the traditional harm that arises from denial of notice and a meaningful opportunity to be heard. By elevating this harm through Section 1681b(b)(3)(A), Congress gave job applicants like Merck a cause of action to seek relief for a harm analogous to that traditional constitutional injury.

## III. Injuries Caused by the Denial of Procedural Due Process Are Concrete Without Any Showing that the Adverse Action Itself Was Erroneous, and So Are Injuries Like Merck's that Arise out of Violations of 15 U.S.C. § 1681b(b)(3)(A).

*TransUnion* does not merely teach that an injury with "a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts is concrete"; it also teaches that courts should look to how that traditional injury is articulated "[u]nder longstanding American law" to help ascertain the scope of the analogous injury elevated by Congress. 594 U.S. at 432. In *TransUnion*, the Court engaged in a close examination of the common-law tort of defamation to aid its analysis of whether various classes of plaintiffs had been concretely injured by TransUnion falsely flagging them as "terrorists" or "potential terrorists" in their credit reports. *Id.* at 433. Of course, the Court did not search for an "exact duplicate" of the defamation harm—the Court concluded that even though defamation required falsity, and the label "potential terrorist" was "not literally false," the plaintiffs subjected to that label still suffered a concrete injury from that label's "misleading" nature. *See id.* ("The harm from being labeled a 'potential terrorist' bears a close

16

relationship to the harm from being labeled a 'terrorist.'").  Yet the Court made clear that the rules governing a traditional injury to which a plaintiff analogizes provide important—albeit not dispositive—guidance into the proper understanding of the contours of the plaintiff's injury.  Here, that means that this Court should engage in a close analysis of the contours of an injury arising out of the denial of procedural due process to aid its understanding of the nature of Merck's injury.

Critically, in procedural due process cases, the lack of notice and an opportunity to be heard—that is, the lack of a constitutionally sufficient process—is part of the injury that a plaintiff suffers.  As the Supreme Court has put it, "the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*."  *Zinermon v. Burch*, 494 U.S. 113, 125 (1990).  Thus, when a plaintiff brings a claim for infringement of procedural due process under the Fifth or Fourteenth Amendment, the plaintiff alleges both a harm resulting from the deprivation of a protected interest in life, liberty, or property *and* a harm in being denied sufficient process in the context of that deprivation.  *See, e.g.*, *Carey*, 435 U.S. at 264-65 (holding that even when a deprivation is found to be "justified," a plaintiff can still recover for "distress caused by the denial of procedural due process itself"); *Am. Premier Underwriters, Inc. v. Nat'l R.R. Passenger Corp.*, 839 F.3d 458, 461 (6th Cir. 2016) ("In procedural-due-process

claims, . . . 'the allegedly infirm process is an injury in itself.'" (quoting *Nasierowski Bros.*, 949 F.2d at 894)).

This closely tracks the injury Merck suffered when Walmart violated Section 1681b(b)(3)(A): his injury stemmed from Walmart's failure to provide him with the statutorily required notice before it inflicted the classic economic harm of revoking his job offer.  By depriving Merck of pre-deprivation notice, Walmart robbed him of an opportunity "to review the reason for any adverse decision and to respond," a "substantive purpose for which the Act compels employee disclosure." *Robertson*, 902 F.3d at 695-96; *accord Long v. Se. Pa. Transp. Auth.*, 903 F.3d 312, 319 (3d Cir. 2018) ("The required pre-adverse-action copy of an individual's consumer report allows him to ensure that the report is true," and "enable[s] him to advocate for it to be used fairly—such as by explaining why true but negative information is irrelevant to his fitness for the job.").

Yet the court below held that "a violation of the FCRA's pre-adverse action notice requirements does not result in concrete harm unless the consumer report was inaccurate or the statutory violation was a but-for cause of the adverse employment action." *See* Op. & Order, Dkt. No. 114, PageID#2605.  According to the court below, because Merck could not show that the information in his background report was erroneous, nor could he demonstrate that Walmart would have actually hired

18

him had he been provided with the report in accordance with the FCRA's requirements, his injury was not susceptible to judicial resolution under Article III.

But that is not how it works in the directly analogous procedural due process context. The Supreme Court's decision in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), provides a remarkably on-point illustration—in the employment context no less. The case involved two plaintiffs, James Loudermill, a security guard who was discharged when his employer discovered he had been convicted of grand larceny and had not disclosed the conviction in his initial employment application, and Richard Donnelly, a school bus mechanic who was discharged for failing an eye exam. *Id.* at 535-37. Both Loudermill and Donnelly were public employees who were fired without a pre-termination hearing, to which they claimed entitlement under the Due Process Clause of the Fourteenth Amendment. *Id.* In ruling that both plaintiffs had been denied a constitutionally adequate process, the Court explained that the rationale behind pre-deprivation notice and hearing in this context was not merely to provide the employee with an opportunity to refute the *factual* basis for the discharge. *Id.* at 543. The Court noted that while many dismissals might involve factual disputes, "[e]ven where the facts are clear, the appropriateness or necessity of the discharge may not be; in such cases, the only meaningful opportunity to invoke the discretion of the decisionmaker is likely to be before the termination takes effect." *Id.*

Indeed, Loudermill and Donnelly's specific cases illustrated this point, as both plaintiffs suffered cognizable injuries *even though* there were no factual inaccuracies underlying their discharges—there was no dispute that Loudermill had neglected to disclose a felony conviction in his job application and that Donnelly had failed a required eye exam. 470 U.S. at 544. Yet "[b]oth respondents had plausible arguments to make" about the bases for their discharges—each could have contextualized the facts, allowing "a fully informed decisionmaker . . . [to] exercise[] its discretion and decide[] not to dismiss him." *Id.* Donnelly could have pointed out that "[t]he examination [he] failed was related to driving school buses, not repairing them." *Id.* at 545 n.10. And Loudermill could have explained that he did not disclose the grand larceny conviction on his employment application because he never knew that it was classified as a felony (he had received only a suspended six-month sentence and fine). *Id.* at 544 & n.9.

Further, Loudermill and Donnelly did not have to demonstrate that "certain success" would have resulted had they been provided with a constitutionally adequate process—in other words, they were not required to show that being given a pre-deprivation opportunity to provide the "plausible arguments" described above would have resulted in a different outcome. *Id.* at 544 (citing *Carey*, 435 U.S. at 266). In fact, the Court noted that Loudermill ultimately had *not* been ordered reinstated (through the constitutionally deficient post-deprivation hearing he had

been afforded), precluding the Court from concluding as a matter of fact that his discharge itself was "mistaken." *Id.*

Thus, it was far from clear that the denial of a pre-deprivation hearing was the "but-for cause" of Loudermill's termination, to use the terminology of the court below. *See* Op. & Order, Dkt. No. 114, PageID#2605. Yet that did not vitiate his injury. As the Supreme Court put it over a century ago, "[t]o one who protests against the taking of his property without due process of law, it is no answer to say that in his particular case due process of law would have led to the same result because he had no adequate defense upon the merits." *Coe v. Armour Fertilizer Works*, 237 U.S. 413, 424 (1915); *see also Rees v. City of Watertown*, 86 U.S. 107, 123 (1873) ("Whether, in fact, the individual has a defence to the debt, or by way of exemption, or is without defence, is not important. To assume that he has none, and, therefore, that he is entitled to no day in court, is to assume against him the very point he may wish to contest.").

It is for this very reason—the fact that "the right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions"—that the Supreme Court held in *Carey v. Piphus* that "the denial of procedural due process should be actionable for nominal damages without proof of actual injury," just as such "'absolute' rights" were treated at common law. 435 U.S. at 266 (citing Dan B. Dobbs, *Law of Remedies* § 3.8, at 191-93 (1973);

21

Charles T. McCormick, *Law of Damages* §§ 20-22 (1935); *Restatement (First) of Torts* § 907 (1939)).  By "without proof of actual injury," the Court did not mean without a sufficiently concrete injury-in-fact to confer standing.  There was no question that the plaintiffs—suspended from public school without a constitutionally adequate hearing—had suffered a cognizable injury.  *Id.* at 266.  Instead, the Court meant that the right to procedural due process is so "absolute" that plaintiffs would be entitled to a judgment in their favor for nominal damages even if they could neither prove that a constitutionally adequate process would have prevented their suspensions, nor that the denial of the procedural due process itself had caused "mental and emotional distress."  *Id.* at 263; *see Farrar v. Hobby*, 506 U.S. 103, 112 (1992) ("*Carey obligates* a court to award nominal damages when a plaintiff establishes the violation of his right to procedural due process." (emphasis added)).

This Court has held the same thing.  Just as in *Carey*, it has repeatedly determined that plaintiffs suffered concrete, judicially cognizable, and redressable harms even *without* determining whether "the same result would have occurred" had each plaintiff been afforded a constitutionally sufficient process.  *See, e.g.*, *Franklin v. Aycock*, 795 F.2d 1253, 1264 (6th Cir. 1986); *Sutton v. Cleveland Bd. of Educ.*, 958 F.2d 1339, 1351-52 (6th Cir. 1992).  In fact, this Court has awarded nominal damages when an employer "violate[d] [a plaintiff's] constitutional right to due process by failing to provide him with an adequate pre-deprivation hearing" even

22

after affirmatively finding that "this failure did *not* ultimately lead to" any other harm. *Kerber v. Wayne Cnty. Emps. Ret. Sys.*, No. 20-1769, 2021 WL 2795802, at *9 (6th Cir. Aug. 2, 2021) (emphasis added). These decisions illustrate that a plaintiff can have standing to pursue a procedural due process claim regardless of his ability to demonstrate success.

That logic directly transfers to this case. Merck received a conditional job offer from Walmart, and that offer was revoked because a consumer report revealed a misdemeanor conviction that he had failed to disclose. By failing to provide sufficient notice as to the basis for the revocation prior to the adverse action, Walmart deprived Merck of the opportunity to "fully inform[] [the] decisionmaker" and ask it to "exercise[] its discretion" in his favor. *Loudermill*, 470 U.S. at 544. That deprivation, coupled with the harmful revocation itself, constituted a concrete injury. This Court should rule accordingly.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

/s/ Brianne J. Gorod
Elizabeth B. Wydra
Brianne J. Gorod
Miriam Becker-Cohen
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

Dated: January 23, 2024

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(a)(5) because it contains 5,592 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that the attached brief *amicus curiae* complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Executed this 23rd day of January, 2024.

<u>/s/ Brianne J. Gorod</u>
Brianne J. Gorod

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system on January 23, 2024.

I certify that all parties in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed this 23rd day of January, 2024.

/s/ Brianne J. Gorod
Brianne J. Gorod

*Counsel for Amicus Curiae*